**FOUR CORNERS SERVICE STATION,
INC., Plaintiff, Appellant,**

v.

**MOBIL OIL CORPORATION,
Defendant, Appellee.**

**FOUR CORNERS SERVICE STATION,
INC., Plaintiff, Appellee,**

v.

**MOBIL OIL CORPORATION,
Defendant, Appellant.**

Nos. 94–1616, 94–1718.

United States Court of Appeals,
First Circuit.

Heard Nov. 9, 1994.

Decided March 22, 1995.

David R. Schaefer, with whom Brenner, Saltzman, Wallman & Goldman, New Haven, CT, was on brief, for Four Corners Service Station, Inc.

Paul D. Sanson, with whom Sheila Huddleston, Shipman & Goodwin, Hartford, CT, and Edward H. Beck, III, Fairfax, VA, were on brief, for Mobil Oil Corp.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

CYR, Circuit Judge.

Four Corners Service Station, Inc. ("Four Corners") appeals a district court judgment under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–2806 (1994) ("PMPA"), disallowing its demands for compensatory damages and attorney fees against Mobil Oil Corporation ("Mobil") for unlawful nonrenewal of Four Corners' franchise agreement. Mobil cross-appeals the PMPA liability judgment entered against it. We affirm the district court judgment in all respects.

## I

## BACKGROUND

Four Corners is a retail gasoline distributor in Three Rivers, Massachusetts. Since 1926, Four Corners had been party to a series of renewable franchise agreements ("Agreements") with Mobil, its exclusive gasoline supplier. The Agreements obligated Four Corners to purchase a specified minimum gallonage per annum, and also set *maximum* gallonage limits or so-called purchase "caps." These caps permitted Mobil to plan against unpredicted fluctuations in franchisee demands for gasoline. The caps increased by ten percent each year to allow for normal franchisee sales growth.

In March 1987, Four Corners discovered that the soil beneath its Three Rivers service station was severely contaminated with gasoline. The Massachusetts Department of Environmental Quality Engineering ("DEQE") issued a notice of responsibility, citing six underground gasoline storage tanks installed by Four Corners between 1942 and 1978 as likely sources of the contamination. Four Corners promptly notified Mobil that the DEQE-ordered remediation, involving the removal and replacement of the storage tanks and 250 cubic yards of contaminated soil, would require an immediate and indefinite closure of the service station, during which Four Corners would not be able to meet its minimum gallonage purchase obligations under the Agreements. Over the next several months, Four Corners repeatedly asked Mobil for advice and information on possible

methods for implementing and funding the required remediation, but to no avail.

Although it promptly completed the required tank removal, Four Corners encountered problems arranging a cost-effective method for disposing of the contaminated soil, a prerequisite to installing replacement tanks and reopening its service station. The estimated costs of transporting the contaminated soil to an out-of-state disposal site ranged between $70,000 and $100,000, but transporters would not provide "firm" cost estimates without first reviewing DEQE site reports. DEQE in turn would not release the site reports until Four Corners signed a final contract with a transporter. Consequently, Four Corners eventually decided to "aerate," a natural remediation method which achieves decontamination on site by exposing the soil to the open air for extended periods of time.

In December 1987, Mobil notified Four Corners of its decision not to renew their sixty-year-old franchise agreement, effective in March 1988, due to Four Corners' breach of certain terms of their Agreements, specifically (1) its failure to meet the minimum gallonage provision; (2) its dilatory cleanup of the environmental contamination; and (3) its closure of the service station for more than seven consecutive days.

In March 1989, Four Corners initiated the present action in federal district court, alleging that Mobil had wrongfully refused to renew the franchise agreement, in violation of PMPA, 15 U.S.C. §§ 2801–2806, for "reasons beyond [Four Corners'] control." The complaint sought reinstatement of the franchise, actual and exemplary damages, attorney fees and costs. *Id.* § 2805.

In the meantime, Four Corners had opened an expanded and modernized service station at the same site in late 1988—under new ownership and management—which purchased its gasoline supplies from British Petroleum until December 1990, and later from Exxon. In July 1991, Four Corners filed a voluntary chapter 11 petition.

Following a jury-waived trial, the district court found that Mobil had violated PMPA by refusing to renew the franchise based on a breach "beyond the reasonable control of the franchisee." *Four Corners Serv. Station, Inc. v. Mobil Oil Corp.,* No. 89–30044–FHF, 1993 WL 767121 (D.Mass. Dec. 2, 1993) (*"Four Corners II"*). Mobil did not prove that Four Corners actually caused the soil contamination, that Four Corners had any choice but to close the station under the mandatory DEQE remediation order, nor that Four Corners unreasonably failed to take the most expeditious approach for effecting soil decontamination. *Id.,* slip op. at 14–15. The PMPA violation notwithstanding, the district court declined to grant reinstatement of the franchise and addressed Four Corners' request for a remedy at law—recovery of lost profits for the projected ten-year residual term of the Mobil franchise. *Id.* at 15.[1] The parties were directed to submit supplemental briefs on the right to recover lost profits. *Id.* at 16.

For the five-year period immediately preceding trial, Four Corners calculated the profits lost due to Mobil's wrongful nonrenewal at $356,099; it estimated its future lost profits for the ensuing five-year period at $171,290. These calculations were based on the contention that Mobil's greater product strength in Western Massachusetts would have enabled Four Corners to sell 30% more Mobil gasoline than it did BP gasoline between 1988 and 1990, and 20% more Mobil gasoline than it did Exxon gasoline between 1991 and 1993.

■ The district court rejected Four Corners' "lost profits" calculations. It found no evidence that Mobil would have permitted Four Corners to exceed the annual purchase caps established in the Agreements. *Four Corners Serv. Station, Inc. v. Mobil Oil Corp.,* No. 89–30044–FHF, slip op. at 5–8, 1994 WL 780708 (D.Mass. Mar. 22, 1994) (*"Four Corners II"*). Moreover, Four Corners actually succeeded in selling *more* BP and Exxon gasoline following Mobil's nonrenewal than it could have sold under the maximum Mobil gallonage limits fixed by the

---

1. As the district court found that Mobil had not violated PMPA willfully, it denied exemplary damages as well. *See infra* note 3.

annual caps. Thus, the court reasoned, Four Corners experienced an increase in profits, not a reduction. *Id.* at 8.[2] Because Four Corners proved no actual damages, the court exercised its discretion, under 15 U.S.C. § 2805(d)(1)(C), and denied an attorney fee award. On appeal, Four Corners challenges only the rulings denying compensatory damages and attorney fees.[3] For its part, the Mobil cross-appeal challenges the district court finding that Mobil violated PMPA.

## II

## DISCUSSION

### A. *Statutory Overview*

■ Congress enacted PMPA to avert the detrimental effects on the nationwide gasoline distribution system caused by the unequal bargaining power enjoyed by large oil conglomerates over their service-station franchisees. *See generally Veracka v. Shell Oil Co.,* 655 F.2d 445, 448 (1st Cir.1981); S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, *reprinted in* 1978 U.S.C.C.A.N. 873, 875–77. PMPA attempts to level the playing field by restricting the grounds upon which a franchisor can assert a unilateral termination or nonrenewal of a franchise. Grounds upon which unilateral termination by a franchisor is permitted under PMPA include (1) "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance," 15 U.S.C. § 2802(b)(2)(A); (2) "[a] failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise," *id.* § 2802(b)(2)(B); *or* (3) "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termi-

nation of the franchise or nonrenewal of the franchise relationship is reasonable," *id.* § 2802(b)(2)(C). The failure of a franchisee to operate the marketing premises for seven consecutive days may constitute a relevant event under PMPA § 2802(b)(2)(C). *Id.* § 2802(c)(9)(A). However, unilateral termination or nonrenewal is not permitted under PMPA if the failure to comply with the terms of the franchise agreement was "beyond the reasonable control of the franchisee." *Id.* § 2801(13).

PMPA also allocates and shifts burdens of proof between the parties to the franchise agreement. In a PMPA-based action for unlawful franchise termination or nonrenewal, the franchisee bears the initial burden of proving that a termination or nonrenewal occurred, at which point the burden of proof shifts to the franchisor to demonstrate that the termination or refusal to renew was based on a legitimate ground enumerated in PMPA. *Id.* § 2805(c).

### B. *Liability: "Reasonable Control"*

#### 1. *Cause of Environmental Contamination*

■ The Mobil cross-appeal asserts two related challenges to the district court ruling on liability. First, it contends that there is no record support for the finding that the actual *cause* of the soil contamination at the Four Corners service station remained "unclear." *Four Corners I,* slip op. at 14. Mobil notes that Four Corners was the only gas station in the vicinity of the contamination; Four Corners had *sole* responsibility for maintaining the storage tanks and was the sole target of the DEQE notice of responsi-

---

**2.** The court based its findings on the following evidence:

| | Actual Sales (gallons) | Potential Mobil Sales | Franchise Caps |
|---|---|---|---|
| 1989 | 1,100,892 | 1,431,159 | 824,602 |
| 1990 | 1,274,643 | 1,657,035 | 907,062 |
| 1991 | 1,083,253 | 1,299,904 | 997,767 |
| 1992 | 985,406 | 1,182,487 | 1,097,545 |
| 1993 (1st quarter) | 185,335 | 222,402 | 301,825 |

**3.** Although the Four Corners' notice of appeal alludes to the district court rulings denying equitable relief and exemplary damages, its appellate

briefs do not challenge these rulings. *See Licari v. Ferruzzi,* 22 F.3d 344, 349 (1st Cir.1994) (claims unaccompanied by adequate argumentation are deemed waived on appeal). As concerns the former issue, therefore, we must assume that Four Corners concedes that an award of lost profits for the projected ten-year residual franchise term, *if proven,* would have afforded it a full and "adequate" remedy at law. *Cf., e.g., McDonald v. Piedmont Aviation,* 793 F.Supp. 75, 78 (S.D.N.Y.1992) (plaintiff waives entitlement to equitable relief by failing to appeal earlier court ruling that damages award would confer an "adequate" remedy in lieu of equitable relief).

bility; Four Corners concededly did not comply with environmental statutes and regulations requiring periodic testing of its storage tanks for leakage, *see* Mass.Gen.L.Ann. ch. 148, § 10 (1994); Mass.Regs.Code tit. 527, §§ 5.05, 9.01 to 9.24 (1983); and noticeable "wet spots" were found on the outer shell of the storage tanks upon excavation. If Four Corners caused the contamination, Mobil argues, nonrenewal was not beyond Four Corners' "reasonable control."

We review the district court factual finding on "reasonable control" and its subsidiary findings on causation only for "clear error." *See, e.g., Roberts v. Amoco Oil Co.,* 740 F.2d 602, 608 (8th Cir.1984) (legislative history of PMPA suggests that Congress intended to favor franchisees by treating "reasonableness" determination as an issue of fact); *Serianni v. Gulf Oil Corp.,* 662 F.Supp. 1020, 1024 (E.D.Pa.1986); *cf. Dedham Water Co. v. Cumberland Farms Dairy,* 972 F.2d 453, 457 (1st Cir.1992) (causation in environmental context is question of fact subject to "clear error" review). Reversal is warranted only if, after considering the entire record, we are left with the "definite and firm conviction that a mistake has been committed." *Interstate Commerce Comm'n v. Holmes Transp., Inc.,* 983 F.2d 1122, 1129 (1st Cir.1993) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *see also* Fed.R.Civ.P. 52(a).

Significantly, the burden of proof on "reasonable control" lay with *Mobil,* not Four Corners. *See* 15 U.S.C. § 2805(c). On appeal, Mobil must point to evidence that fairly compelled a finding that Four Corners—and Four Corners *alone*—caused the contamination. *See Reich v. Cambridgeport Air Sys.,* 26 F.3d 1187, 1188 (1st Cir.1994) (" 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' ") (citations omitted). Since it has not done so, we find no clear error.

First, DEQE found no holes in the tanks. Nor did the "wet spots" constitute conclusive evidence of tank leakage, since they could have been caused by contamination emanating outside the tanks. Four Corners cited a

United States Environmental Protection Agency document which suggests that gasoline spills by *oil transporters* during gasoline delivery are among the most common causes of soil contamination at service stations. *See* 53 Fed.Reg. 37087, 37090, 37133 (1988). Finally, the notice of responsibility issued by DEQE rested on Four Corners' legal status as the current owner/operator of the service station facility for *strict liability* purposes only. It did not purport to represent a determination that Four Corners caused the contamination.

Likewise, the record evidence does not compel a finding that Four Corners might have averted the bulk of the soil contamination by more diligent testing of its tanks. Mobil neither produced *evidence* as to *when* the contamination occurred, nor asserted that the environmental "detection" statutes and regulations of the 1980s were retroactive. Further, there was no evidence which would exclude leakage from other pumping system components (pumps, hoses, pipes); that is, leakage which could not have been detected by testing the tanks. Finally, since there was no evidence that Mobil investigated any of these matters *before* it decided not to renew the Four Corners franchise, the district court might well have treated this contention as a *post hoc* rationalization. *See Desfosses v. Wallace Energy, Inc.,* 836 F.2d 22, 29 (1st Cir.1987) (noting that PMPA notification requirements ensure that franchisor cannot invent after-the-fact justifications for termination or nonrenewal). As Mobil failed to meet its burden of proof on the factual issues underlying the district court ruling on "reasonable control," the finding stands.

### 2. *"Financial Inability" to Remediate*

Mobil likewise challenges the district court ruling that Four Corners lacked the financial ability to remediate the soil contamination. It contends that the ruling was infected by legal error, in that the court wrongly regarded Four Corners' financial inability to pay for out-of-state disposal, the costlier but more expeditious method of remediation, as a circumstance beyond the franchisee's reasonable control. If this were true, Mobil argues, any franchisee who came

upon hard times and could not afford to pay Mobil for its oil purchases would be exempt from unilateral termination. *See, e.g., California Petroleum Distribs. v. Chevron U.S.A.,* 589 F.Supp. 282, 288 (E.D.N.Y.1984); *Cantrell v. Exxon Co., U.S.A.,* 574 F.Supp. 313, 317 (M.D.Tenn.1983). Even if we were to agree with the reasoning of the two decisions cited by Mobil, however, the district court simply did not find that Four Corners' choice of a less expeditious remediation program was beyond its reasonable control *because* Four Corners could not afford more expeditious measures. Indeed, Four Corners itself adduced evidence that its then owner, Richard Tenczar, could have obtained financing for out-of-state disposal if necessary.

Mobil's contention is a thinly veiled attempt to frame the present "clear error" challenge, *see Roberts,* 740 F.2d at 608, as an issue of law subject to *de novo* review. *See Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 154 (1st Cir.1990) ("The 'clearly erroneous' rule cannot be evaded by the simple expedient of creative relabelling.... by dressing factual disputes in 'legal' costumery."). The central inquiry—that of "reasonableness"—must be undertaken in light of *all* the circumstances. In that vein, we cannot ignore the subsidiary finding by the district court that Mobil repeatedly ignored Four Corners' pleas for guidance and assistance on how best to remediate service-station soil contamination. *See Four Corners I,* slip op. at 14 ("Mobil offered no assistance that was refused by Four Corners which would evidence a lack of desire on the part of Four Corners to remedy the problem as expeditiously as possible."); *cf., e.g., Malone v. Crown Cent. Petroleum Corp.,* 474 F.Supp. 306, 311 (D.Md.1979) (upholding franchise termination where franchisee deliberately failed to heed franchisor's warnings or accept its "good faith" advice about more profitable marketing strategies). Four Corners was left entirely to its own devices, in the awkward position of having to determine the most cost-effective remediation method, which involved balancing projected future service-station revenue losses occasioned by a more prolonged closure, against the unconfirmable—but unquestionably higher—immediate costs of a more expeditious remediation. In these circumstances, the district court reasonably could find that Four Corners acted in good faith, and that Mobil's reticence to assist was prompted by its desire to rid itself of the franchisee requesting its assistance. As there was no clear error, the liability judgment against Mobil must stand.

## C. Damages

### 1. The Maximum Gallonage Provision

■ Four Corners impugns the district court's reliance on the annual gallonage *caps* as the basis for finding that Four Corners lost no profits as a result of the nonrenewal. It argues that the district court was required to predict whether Mobil would have waived the caps in each successive year had the franchise not been wrongfully terminated in 1988. It points out that a Mobil manager testified that Mobil had an "internal mechanism" for authorizing such waivers where franchisees have renovated or expanded service stations in order to increase their gasoline sales by more than ten percent over the previous year. Consequently, Four Corners contends, were Mobil to have refused a waiver in these circumstances its action would have been arbitrary and discriminatory, in violation of PMPA.

■ Normally, the plaintiff must bear the burden of proving actual damages. *See, e.g., Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 816 (1st Cir.) (citing cases), *cert. denied,* 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988). Four Corners has not suggested that a different burden allocation obtains under PMPA. Therefore, we assume that the burden of proof rested with Four Corners. A challenge to the district court's findings on the actual amount of damages sustained by a claimant presents a question of fact, which we review only for "clear error." *See, e.g., American Title Ins. Co. v. East West Fin. Corp.,* 16 F.3d 449, 461 (1st Cir.1994).

The record evidence did not compel a finding that Mobil would have waived the 1988–91 caps on Four Corners' gasoline purchases. Judy Schultz, district sales manager for Mo-

bil, testified that Mobil imposed these contractual caps to protect itself from the considerable expense which would attend unpredictable or unanticipated increases in franchisee demand for on-hand gasoline supplies. She further noted that the gallonage caps automatically increased by ten percent per year. A franchisee which wanted a waiver of the cap would need to obtain prior approval from the general manager for the Mobil region, the wholesale manager, and the district sales manager. When pressed by Four Corners, however, Schultz testified that she did not know of any Mobil franchisee which had actually obtained a waiver.

Even assuming, *arguendo*, that Four Corners' burden of proof could have been sustained by showing that Mobil had an established "internal mechanism" for affording relief from the gallonage caps beyond the automatic ten-percent annual increase, and that Four Corners itself met the criteria for such a waiver in the years 1988–91, the Schultz testimony fell well short of such a showing. It identified no criteria, nor did it indicate that any such waiver procedure had *ever* been invoked, either by Mobil or·a franchisee. Moreover, Four Corners proffered *no* independent evidence that *any* Mobil franchisee, let alone a franchisee in a position comparable to Four Corners', had ever requested or· been granted any such extraordinary waiver. *Cf., e.g., Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1438 (10th Cir.1987) (noting existence of factual dispute whether franchisor offered plaintiff less favorable terms than its other franchisees); *Valentine v. Mobil Oil Corp.*, 614 F.Supp. 33, 39 (D.Ariz.1984) (finding no evidence that franchisor treated plaintiff differently than franchisor's other franchisees), *aff'd*, 789 F.2d 1388 (9th Cir.1986). Thus, there is no record evidence even suggesting that the district court finding that Four Corners would not have been granted a gallonage cap waiver constituted clear error. *See Four Corners II*, slip op. at 8.

### 2. *Lost Profits for 1992 and 1993*

▮ Next, Four Corners contends that it lost profits in 1992, and during the first quarter of 1993, when the gallonage caps under its wrongfully terminated Mobil fran-

chise first began to *exceed* its actual Exxon gasoline sales or its potential Mobil gasoline sales. *See supra* note 2. For example, in 1992, Four Corners could have sold 112,139 more gallons (*viz.*, the difference between its 1,097,545 gallon Mobil cap and its actual Exxon sales of 985,406 gallons) *even assuming* that Mobil refused to waive its cap. Thus, Four Corners claims, it was entitled to recover these discrete losses, which were proximately caused by Mobil's wrongful non-renewal under PMPA.

This claim can succeed only if the measure of *compensatory* damages under PMPA may *exceed* the level required to make the plaintiff-franchisee *whole* for whatever injury or loss flowed from the franchisor's wrongful conduct. *But cf., e.g., Linn v. Andover Newton Theological Sch.*, 874 F.2d 1, 8 (1st Cir. 1989) (noting that plaintiff failed to suggest that either the ADEA or contract law entitled him to be made "more than whole"). Four Corners points to no authority for this counterintuitive assumption, nor is there anything in PMPA's language or legislative history to suggest that Congress intended· to deviate from the normal presumption, uniformly applied to numerous other causes of action arising under federal remedial statutes, that·*compensatory* damages may not exceed the amount necessary to make the injured party *whole*. *See, e.g., Midwest Petroleum Co. v. American Petrofina Mktg., Inc.*, 644 F.Supp. 1067, 1071 (E.D.Mo.1986) (noting PMPA franchisee is not entitled to "double recovery" where it has otherwise mitigated harmful effects of defendant's violation; *see also Russo v.. Texaco Inc.*, 630 F.Supp. 682, 687 (E.D.N.Y.) (PMPA is a diminution of franchisors' common-law contract rights, and its remedial provisions should not be unduly extended beyond statute's express· language and purpose), *aff'd*, 808 F.2d 221 (2d Cir.1986).

Since Four Corners requested the district court to presume that its sixty-year-old Mobil franchise would have remained in force another ten years but for Mobil's wrongful nonrenewal, the court was required to determine the *aggregate net* profits Four Corners would lose during the *entire* ten-year period. The record evidence reveals that Four Cor-

ners actually realized an overall *increase* approximating $215,000, in total net profits and interest, as a consequence of having been freed from the Mobil gallonage caps during the five years immediately preceding trial.[4] Thus, the profits allegedly lost in 1992–93 clearly were not recoverable as discrete losses over and above the incidental profits gained during the entire five-year period.

### 3. *Future Profits*

■ Four Corners insists that the district court simply ignored its claim to $171,290 in *future* lost profits. *See Thompson v. Kerr–McGee Ref. Corp.*, 660 F.2d 1380, 1388 (10th Cir.1981) (future lost profits recoverable under PMPA), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982); *cf. Wallace Motor Sales, Inc. v. American Motor Sales Corp.*, 780 F.2d 1049, 1062 (1st Cir.1985) (automobile dealership entitled to claim damages for lost profits over projected life span of franchise). Although Four Corners would incur these damages in each future year because the gallonage caps would continue to outstrip Four Corners' actual sales of Exxon gasoline, or its projected sales of Mobil gasoline, until 1998, this claim too is flawed.

In truth, the district court was fully cognizant of Four Corners' claim for future profits, as it explicitly acknowledged in its opinion. *See Four Corners II*, slip op. at 3. Moreover, the record evidence discloses that there was little likelihood that Four Corners could have remained in business until 1998. Furthermore, there were serious deficiencies in its forecasts of future lost profits. *See Levy v. FDIC*, 7 F.3d 1054, 1056 (1st Cir.

1993) (appellate court is free to affirm on any ground supported by record).

Four Corners extrapolated its estimates of future *lost* profits based on its performance during the two years immediately preceding trial; that is, it assumed that Mobil's refusal to renew its franchise was alone responsible for the dismal profit picture during the time Four Corners was in serious financial straits and selling Exxon gasoline.[5] During the first quarter of 1993 alone, Four Corners lost $47,754, compared with a $107,154 net profit in 1990, this *notwithstanding* the infusion of approximately $215,000 in profits and interest income which could not have been realized but for Mobil's termination of the franchise in 1988. *See supra* note 4. Thus, Four Corners projected continued future business operations despite such severe losses as would make its prospects for continued operation *until 1998* highly speculative. *See Midwest Petroleum Co.*, 644 F.Supp. at 1070 ("To warrant a recovery of lost profits, the [franchisee] must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts.").

Finally, even if Four Corners had been able to continue in business until 1998, its claim to $171,000 in future lost profits would be groundless given the record evidence that it had already realized an aggregate net *increase* in profits and interest approximating $215,000 during the five-year period immediately prior to trial. *See supra* note 4. Accordingly, even if the district court had allowed all speculative lost future profits claimed, Four Corners still would have realized approximately $44,000 in aggregate net

4. Assuming constant retail prices and operating costs, the following would approximate Four Corners' profits (losses) during each of the five years immediately preceding trial:

| Year | Change in Net Profits as Mobil Station with Rate Caps in Force | Estimated Interest | Interest on Profit | Total Gain or Loss |
|---|---|---|---|---|
| 1988: | ($ 1,004) | 52% | ($ 528) | ($ 1,532) |
| 1989: | $ 69,571 | 45% | $ 31,306 | $100,877 |
| 1990: | $100,426 | 34% | $ 34,144 | $134,570 |
| 1991: | $ 21,655 | 22% | $ 4,764 | $ 26,419 |
| 1992: | ($ 19,568) | 10% | ($ 1,956) | ($ 21,524) |
| 1993: | ($ 22,872) | 3% | ($ 686) | ($ 23,558) |
| Total | $148,208 | | $ 67,044 | $215,252 |

5. The chapter 11 filing constituted an event of default under the Agreements, *see* Agreement ¶ 24(B)(4), and may have afforded Mobil an independent basis for termination or nonrenewal in 1991. Although it is questionable whether a franchisor could rely on such an event to cut off PMPA damages *if* it appeared that the franchisor wrongfully refused to renew prior to the chapter 11 petition, thereby *causing* the franchisee's financial problems, Four Corners' *greater profits* in the years 1988–91 tend to undercut such a causal connection.

profits ($215,000 net increased profits, less $177,000 future profits) during the projected ten-year life span of the franchise following Mobil's wrongful refusal to renew.

### D. *Attorney Fees Under PMPA*

Lastly, Four Corners challenges the denial of its request for an attorney fee award against Mobil based on the PMPA violation. First, it claims that the district court's factual findings were inadequate under Fed.R.Civ.P. 52. Second, it says that the district court was somehow constrained to allow a fee award because Congress meant to encourage prevailing franchisees to vindicate their rights under PMPA.

A denial of an attorney fee award is reviewed only for abuse of discretion. *See Catullo v. Metzner,* 834 F.2d 1075, 1085 (1st Cir.1987). Under PMPA, *see* 15 U.S.C. § 2805(d)(1)(C), an attorney fee award is discretionary where the plaintiff recovers neither actual nor exemplary damages. Not only did Four Corners sustain no provable damages, but the record evidence indicates that it generated approximately $44,000 more in aggregate net profits during the projected remaining life span of the Mobil franchise as a consequence of having been freed from the Mobil franchise gallonage caps since 1988. Four Corners likewise failed to win equitable reinstatement of its Mobil franchise. *Cf. Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.,* 749 F.Supp. 331, 333 (D.Mass. 1990) (plaintiff which obtains equitable relief under PMPA is entitled to attorney fee award even absent recovery of actual or exemplary damages).

Without in any sense diminishing Mobil's clear violation of PMPA, we cannot say that the district court abused its discretion in denying an attorney fee award on the present record. Nor do we think that Congress intended to *compel* attorney fee awards under PMPA as an inducement to franchisees to pursue vindication in these circumstances.

*The district court judgment is affirmed. Costs are awarded to cross-appellee in appeal No. 94–1718.*