USCA1 Opinion

 

 October 26, 1995 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-1314 SHELL OIL COMPANY, Plaintiff, Appellant, v. K.E.M. SERVICE, INC., Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior District Judge] _____________________  ____________________ Cyr, Boudin and Lynch, Circuit Judges. ______________  ____________________ George A. Nachtigall, with whom Mark A. Pogue, Marc A. Crisafulli ____________________ _____________ __________________ and Edwards & Angell were on brief for appellant. ________________ Paul J. Pisano, with whom Paul J. Pisano Law Associates, Albert ______________ ______________________________ ______ R. Romano and Romano, Spinella & Hayes were on brief for appellee. _________ ________________________  ____________________  ____________________ Per Curiam. Shell Oil Company ("Shell") sued, under Per Curiam. ___ ______ the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq. __ ____ ("PMPA"), to terminate its franchise agreement and lease with K.E.M. Service, Inc. ("K.E.M.") due to alleged contract viola- tions. K.E.M. counterclaimed, and Shell now appeals a prelimi- nary injunction requiring it to continue selling gasoline to K.E.M. pending final adjudication of Shell's PMPA-based claims. See Shell Oil Co. v. K.E.M. Serv., Inc., No. 95-001B (D.R.I. Feb. ___ _____________ __________________ 16, 1995). As the record does not enable a determination that the district court manifestly abused its discretion in finding that "there exist sufficiently serious questions going to the merits [of Shell's claims and K.E.M.'s defenses] to make such questions a fair ground for litigation," 15 U.S.C. 2805(b)(A), we affirm. We state the material facts briefly. K.E.M. and its president/owner, John Gorter, operate a Shell retail gasoline station in East Greenwich, Rhode Island. Their current five-year franchise and lease agreement (hereinafter: "Agreement") expires in 1998. According to K.E.M., Shell decided in 1993 to install another franchisee on the leased premises, and when Gorter declined a buy-out offer, Shell initiated a bad-faith effort to oust K.E.M. prematurely from its franchise/lease. To this end, Shell audited and cited K.E.M. for violations of Rhode Island environmental regulations, specifically for its failure to keep a written record of daily gasoline inventory reconciliations on the leased premises. Further, Shell abruptly altered its longstand- 2 ing policy of delivering "short loads" i.e., less than full tank-truck loads of gasoline to K.E.M. Since K.E.M. has limited underground storage-tank capacity, it was forced to buy and sell non-Shell gasoline in short loads, or else cease opera- ___ tion. Shell contends that its alleged bad faith is irrelevant under the PMPA, given that K.E.M. admittedly engaged in the "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations." 15 U.S.C. 2802(c)(10); see ___ Agreement Art. 18.1(c)(10) (same). Shell also argues that, in at least two respects, K.E.M. "knowing[ly] fail[ed] . . . to comply with . . . State . . . [environmental] laws or regulations relevant to the operation of the marketing premises," 15 U.S.C.  2802(c)(11); Agreement Art. 18.1(c)(11) (same). First, although K.E.M. kept gasoline inventory figures and performed a daily inventory reconciliation, it failed to record the final amount of any differential in its written records. See Rhode Island Dep't ___ of Envtl. Management Regulation DEM-DWM-UST04-93, 13.00 et __ seq. (1993). Second, K.E.M.'s records were in the possession of ____ its accountant, rather than at the service station. Shell cites case law to the effect that a franchisor's unilateral termination of a franchise is conclusively presumed "reasonable," as a matter of law and regardless whether the motives for the termination are unfairly coercive or sinister, if the franchisee has committed any of the twelve acts enumerated in PMPA 2805(c). See, e.g., ___ ___ ____ Russo v. Texaco, 808 F.2d 221, 225 (2d Cir. 1986).  _____ ______ 3 K.E.M. counters that PMPA 2802(c) contemplates two types of equitable exceptions to the presumption prescribed in  2805(c). First, any purported PMPA recordkeeping violation was merely "technical," since K.E.M. substantially complied with Rhode Island environmental regulations. Second, Shell pressured K.E.M. into violating the PMPA ban on gasoline misbranding by preying on its hand-to-mouth fiscal condition when it abruptly changed its longstanding course of dealing regarding deliveries of "short loads." K.E.M. contends that it faced an irresoluble dilemma: either buy non-Shell gasoline for resale, or cease its retail operation for more than seven days, thereby committing a separate violation constituting an independent ground for fran- chise termination. See 15 U.S.C. 2802(c)(9).  ___ An appellant challenging a preliminary injunction must bear the "heavy burden" of showing that the district court committed a mistake of law or a manifest abuse of discretion. Gately v. Commonwealth of Mass., 2 F.3d 1221, 1225 (1st Cir. ______ ______________________ 1993), cert. denied, 114 S. Ct. 1832 (1994); see 28 U.S.C.  _____ ______ ___ 1292(a)(1). Due deference must be accorded the ruling below, since the district court is "steeped in the nuances of a case and mindful of the texture and scent of the evidence." K-Mart Corp. ____________ v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989). ____________________ Under the PMPA, preliminary injunctive relief is more readily available to franchisees than was the case at common law. See, e.g., Narragansett Indian Tribe v. Guilbert, 934 F.3d 4, 5 ___ ____ __________________________ ________ (1st Cir. 1991) (describing four-part, common law standard); but ___ 4 cf. Nassau Boulevard Shell Serv. Station, Inc. v. Shell Oil Co., ___ __________________________________________ _____________ 875 F.2d 359, 364 (2d Cir. 1989) (noting that PMPA franchisor __________ must meet traditional, four-part test for preliminary injunc- tion). Because the PMPA is a remedial statute, see infra, a ___ _____ franchisee need not demonstrate a likelihood of success on the __________ merits, but merely that the franchisor terminated the franchise and that "there exist sufficiently serious questions going to the ____________ _______ _________ merits to make such questions a fair ground for litigation." 15 ____ ______ ___ __________ U.S.C. 2805(b)(1)(A) (emphasis added). See, e.g., Doebereiner ___ ____ ___________ v. Sohio Oil Co., 880 F.2d 329, 332 (11th Cir. 1989), modified on _____________ ________ __ other grounds, 893 F.2d 1275 (1990); Sun Ref. & Mktg. Co. v. _____ _______ ______________________ Rago, 741 F.2d 670, 673 (3d Cir. 1984).1 ____ Based on a careful evaluation of the record below, we cannot conclude that the district court either committed a mistake of law or abused its discretion in ruling that K.E.M.'s proposed defenses were "sufficiently serious" to constitute "fair ground[s] for litigation." Contrary to Shell's contention, the question whether the PMPA admits of "equitable" exceptions which would excuse a franchisee's noncompliance with state environmen- tal regulations or its gasoline misbranding are matters of first impression in this circuit, upon which we express no opinion at  ____________________ 1PMPA 2805(b)(2)(B) does require the court to balance the relative hardships to the parties in granting or denying prelimi- nary injunctive relief. Shell does not challenge this aspect of the district court ruling. See Shell Oil Co., No. 95-001B, slip ___ _____________ op. at 15 (D.R.I. Feb. 16, 1995).  5 this juncture.2  Proper resolution of these important matters if necessary requires a more thorough exposition of the course of dealing between the parties during their nine-year franchise relationship. For example, section 2805(c)(11) proscribes a franchisee's "knowing failure" to comply with state law. Section _______ 2801(13), however, defines "failure" to exclude "any failure _______ which is only technical or unimportant to the franchise relation- _________ ship." 15 U.S.C. 2801(13)(A). Although Shell contends that K.E.M.'s violation was not "technical," it adduced no evidence that it had ever threatened to terminate or terminated other franchisees for comparable regulatory noncompliance, nor that the State of Rhode Island had ever cited or fined a service station owner for these types of violations. See S. Rep. No. 95-731, 95th ___ Cong., 2d Sess. 15, reprinted in 1978 U.S.C.C.A.N. 873, 874 _________ __ (noting that Congress designed the PMPA with the general purpose  ____________________ 2Our decision in Desfosses v. Wallace Energy, Inc., 836 F.2d _________ ____________________ 22 (1st Cir. 1987), deals with PMPA 2802(c)(4), and not with  2802(c)(10) or (11). Although we there referred in general terms to the "conclusive presumption of reasonableness" theory set forth in Russo, supra, Desfosses had not defended on the ground _____ _____ ___ that the franchisor had based its termination or nonrenewal on a purely "technical" violation of state law, nor that the fran- chisor's own conduct had coerced Desfosses into violating the PMPA. Indeed, 2802(c)(4) does not pertain to violative acts of __ the franchisee, but to acts entirely within the franchisor's ___ __________ ______ ___ ____________ control. 15 U.S.C. 2802(c)(4) (providing for termination or _______ nonrenewal upon the "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if . . . the franchisee was notified in ________ writing, prior to the commencement of the term of the then existing franchise . . . of the duration of the underlying lease . . . ."). Desfosses simply claimed that Wallace had not provid- ed him with the requisite notice. Desfosses, 836 F.2d at 26. ______ _________ 6 to protect "franchisees from arbitrary and discriminatory termi- _________ nations or non-renewals of their franchises") (emphasis added). At this juncture, we conclude that K.E.M.'s alleged lapses are at least arguably de minimis. Since K.E.M. does possess the raw __ _______ ___ gasoline inventory data in written form with which State ________ _________ ____ auditors could test its daily inventory reconciliations, we can discern no manifest abuse of discretion in the district court ruling that the "technicality" of this asserted ground for termination presented K.E.M. with a colorable defense, i.e., a "fair ground for litigation." See Shell Oil Co., No. 95-001B, ___ ______________ slip op. at 13 (D.R.I. Feb. 16, 1995). Similarly, "Congress enacted PMPA to avert the detri- mental effects on the nationwide gasoline distribution system caused by the unequal bargaining power enjoyed by large oil conglomerates over their service-station franchisees." Four ____ Corners Serv. Station, Inc. v. Mobil Oil Corp., 51 F.3d 306, 310 ___________________________ ________________ (1st Cir. 1995). See Desfosses v. Wallace Energy, Inc., 836 F.2d ___ _________ ____________________ 22, 25 (1st Cir. 1987) (noting that PMPA "'must be given a liberal construction consistent with its overriding purpose to protect franchisees'") (citing Brach v. Amoco Oil Co., 677 F.2d _____ ______________ 1213, 1221 (7th Cir. 1982)). It also left "'to the courts the task of resorting to traditional principles of equity to maximize attainment of the competing statutory objectives consistently with . . . the purposes of the [PMPA].'" Shell Oil Co. v. K.E.M. _____________ ______ Serv., Inc., No. 95-001B, slip op. at 11 (D.R.I. Feb. 16, 1995) ___________ (quoting S. Rep. No. 95-731). Accordingly, were discovery and 7 trial to disclose that Shell knowingly took inequitable advantage of K.E.M.'s precarious market position and inferior bargaining position, the question whether Congress contemplated "equitable" exceptions to section 2802(c)(10)'s "willful misbranding" prohi- bition would be presented on a fully developed factual record.  Finally, equitable relief from section 2802(10) might be considered more appropriate were K.E.M. to demonstrate at trial that Shell had breached the Agreement first, leaving K.E.M. with the Hobson's choice of buying non-Shell gasoline or going out of business. The Agreement expressly provides that Shell has no contractual obligation to deliver "short loads" to K.E.M. See ___ Agreement Art. 9.1. On the other hand, Shell abruptly ceased providing K.E.M with "short loads" after a nine-year course of _____ dealing. Course of dealing may be competent evidence of a subsequent modification of a written contract. See, e.g., R.I. ___ ____ Gen. Laws 6A-1-205, 6A-2-202. Although the Agreement contains a provision barring nonwritten modifications, see Agreement Art. ___ 26, the PMPA specifically provides that franchise agreements may be written or oral. See 15 U.S.C. 2801(10), 2801(1)(A), (B) __ ____ ___ (defining "franchise" as "contract"); see also Royer v. Royer, ___ ____ _____ _____ 501 A.2d 739, 741 (R.I. 1985) ("[A] written contract may be modified by subsequent oral agreement of the parties," even where contract expressly requires written modification only.); J. Koury ________ Steel Erectors, Inc. v. San-Vel Concrete Corp., 387 A.2d 694, 697 ____________________ ______________________ (R.I. 1979) (describing implied-in-fact contracts arising from course of dealing).  8 What is more important, the PMPA's definition of "contract" expressly provides that, "[f]or supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels." 15 U.S.C. 2801(10). If the "short load" delivery levels became part of a modified Shell-K.E.M. franchise contract, Shell's abrupt change of course might constitute a breach of the fran- chise agreement. Thus viewed, K.E.M.'s "equitable" defense to section 2802(c)(10) might be considered at least "colorable," since K.E.M. might make a plausible argument that Congress could not have intended to permit franchisors to resort to conclusive presumptions of "reasonableness" under section 2802(c) where their own breach of the franchise agreement afforded the means of _____ securing a per se right of termination.  ___ __ Given the prominent equitable mandate in the PMPA's legislative history, as well as the nebulous and undeveloped factual record, we cannot conclude that the district court manifestly abused its discretion in deciding that "serious questions going to the merits [of Shell's claim and K.E.M.'s defenses offer] . . . fair ground for litigation." Nor do we presume to determine the relative merits, either of Shell's claims or K.E.M.'s defenses.  The preliminary injunction is affirmed and the case is ___ ___________ __________ __ ________ ___ ___ ____ __ remanded to the district court for further proceedings. ________ __ ___ ________ _____ ___ _______ ___________ 9