VISITING NURSE ASSOCIATION
OF NORTH SHORE, INC., et
al., Plaintiffs, Appellees,

v.

Bruce M. BULLEN, et al., Defendants,
Appellants.

VISITING NURSE ASSOCIATION
OF NORTH SHORE, INC., et
al., Plaintiffs, Appellants,

v.

Bruce M. BULLEN, et al.,
Defendants, Appellees.

Nos. 95–1849, 95–1999.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1996.

Decided Aug. 22, 1996.

Douglas H. Wilkins, Assistant Attorney General, Boston, MA, with whom Scott Harshbarger, Attorney General, and William L. Pardee, Assistant Attorney General, were on brief, for appellants Bullen, et al.

Richard P. Ward, Boston, MA, with whom John H. Mason, Susan T. Nicholson and Ropes & Gray were on brief, for appellees

Visiting Nurse Association of North Shore, Inc., et al.

Before CYR, BOUDIN and STAHL, Circuit Judges.

CYR, Circuit Judge.

Nine Massachusetts health care providers initiated this civil rights action under 42 U.S.C. § 1983, alleging substantive and procedural violations of the Medicaid Act, *see* 42 U.S.C. § 1396a(a)(30) ("Act"), by the named defendants, various officials of the Massachusetts Medicaid program. The district court granted partial summary judgment for plaintiffs, declaring defendants in noncompliance with certain procedural requirements relating to the establishment of reimbursement rates for health care services provided to Medicaid recipients. Defendants appealed. Plaintiffs cross-appealed a district court ruling dismissing their remaining claims. We reverse the district court judgment against defendants and dismiss the cross-appeal.

## I

### *BACKGROUND*

Medicaid is a joint federal-state program designed to afford medical benefits to low-income individuals. *See* 42 U.S.C. § 1396 *et seq.*; *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513–24, 110 L.Ed.2d 455 (1990). A State which elects to participate in Medicaid is eligible to receive federal funds only if its State Plan is approved by the Federal Health Care Financing Administration ("HCFA").[1] Among the sixty-two criteria for HCFA approval, *see* 42 U.S.C. § 1396a(a)(1)-(62), is the so-called "equal access" clause:

[A State plan for medical assistance must] provide such *methods and procedures* relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b (i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments* are consistent with efficiency, economy, and quality of care and *are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.*

*Id.* § 1396a(a)(30) (emphasis added); 42 C.F.R. § 447.201(b) ("The plan must describe the policy and the methods to be used in setting payment rates for each type of service. . . .").

Massachusetts establishes its reimbursement rates through the Massachusetts Rate Setting Commission, with the approval of the Division of Medical Assistance of the Massachusetts Executive Office of Health and Human Services ("DMA"). *See* Mass.Gen.L. ch. 6A, §§ 32, 36. Before 1991, Massachusetts used a "cost-based" methodology for setting reimbursement rates, laconically described in its approved plan as "fixed negotiated fee schedules." Ostensibly, the term "negotiated" connoted an intent to calculate a different rate for *each* individual health care provider, based on its reported costs for delivering five different categories of medical services (skilled nursing, occupational, physical and speech therapy, and home-health-aide services) during the preceding fiscal year, adjusted for such uniform factors as inflation and allowing for incentive caps (e.g., to promote efficiency). *See* Mass.Regs.Code tit. 114.3, § 3.00.

In 1991, however, Massachusetts decided to convert its rate-setting methodology to a so-called "class rate" system. Rather than basing reimbursement rates on the individual health care provider's idiosyncratic costs for the previous year, DMA decided to propose a single, fixed reimbursement rate for each of the five medical services categories, *supra,* which would be applied across-the-board to all in-state health care providers, without regard to their individual costs. During the

---

**1.** Authority to administer the Medicaid program and promulgate implementing regulations has been delegated to HCFA, a constituent agency of the Department of Health and Human Services. *See* 42 U.S.C. § 1302; 49 Fed.Reg. 35,247, 35,- 249 (1984); *see also Elizabeth Blackwell Health Ctr. for Women v. Knoll,* 61 F.3d 170, 174 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 816, 133 L.Ed.2d 760 (1996).

transition to the new "class rate" system, a series of "interim" and "phase-in" rates were to be utilized.

Under the Medicaid Act and regulations, a State must meet two conditions before instituting "material" or "significant" changes in its Medicaid program:[2] i.e., (1) submit a Plan amendment to HCFA for approval, "*describ[ing]* " the methods used to set rates under 42 U.S.C. § 1396a(a)(30), *see* 42 C.F.R. § 447.201(b) (emphasis added), and (2) provide public notice "*describing* the proposed change[s]" and "[e]xplain[ing] why [it] is changing its methods and standards," *see id.* § 447.205(c)(1), (3) (emphasis added).

During a thirty-month period beginning in June 1991, Massachusetts issued public notices relating to the proposed change, and published a series of regulations, setting forth the interim, phase-in, and final class rates in "bottom-line" dollar figures for each of the five medical service categories, without detailing the particular formula and factors used to arrive at the proposed "bottom-line" rate figures. Thereafter, DMA conducted a series of public meetings to explain the proposed changes to health care providers, including appellees, and other interested parties. On January 1, 1994, the final class rates took effect, superseding the interim and phase-in rates.

Plaintiffs soon filed this section 1983 action, alleging that the DMA commissioner and its members had violated various substantive and procedural requirements prescribed by 42 U.S.C. § 1396a(a)(30).[3] By way of procedural violations, the complaint alleged that the pre-January 1994 public notices issued by defendants contained legally deficient "descriptions" of the proposed new methods and procedures, by failing to disclose the *formula* defendants used to arrive at either the interim, phase-in, or final class rates. The complaint further alleged that defendants failed to file an appropriate amendment to the Massachusetts Plan, "describing" the "material" changes in its reimbursement rate methodology. Plaintiffs moved for partial summary judgment on their two procedural claims.

Massachusetts filed a Plan amendment ("Amendment 003") with the HCFA regional office in March 1994.[4] The amendment indicated the proposed change from a cost-based to a "class rate" system by deleting a single word from the original Plan description: "fixed negotiated fee schedules" now became simply "fixed fee schedules." Although a Plan amendment is deemed approved unless HCFA acts within ninety days of its filing, *see* 42 C.F.R. § 430.16(a), HCFA tolled the ninety-day period by advising defendants that additional information was needed—*i.e.*, "the methodology or formula for the calculation of the fixed rate"—to enable a final approval determination. *See id.* § 430.16(a)(1)(ii).

Prior to the time DMA responded to the HCFA request for information, and before any final HCFA decision on Amendment 003, the district court granted partial summary judgment for plaintiffs on their procedural claims, ruling that neither Amendment 003 nor defendants' pre-January 1994 public notices provided adequate detail on the proposed "methods and procedures" for calculating final class rates. *See Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen*, 866 F.Supp.

---

**2.** We accept, *arguendo*, defendants' concession that the conversion to a "class rate" system constituted a "significant" and "material" change.

**3.** As substantive violations, plaintiffs first alleged that the State had adopted its new methodology solely for the impermissible purpose of limiting its financial outlays under the Medicaid program, contrary to 42 U.S.C. § 1396a. *See Amisub (PSL), Inc. v. Colorado Dep't of Social Servs.*, 879 F.2d 789, 800–01 (10th Cir.1989), *cert. denied*, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990). Second, plaintiffs alleged that the class rates arrived at under the new fixed-rate method-ology were so arbitrary and unreasonably low that many health care providers would have no financial incentive to participate in the Massachusetts Medicaid program, thereby ensuring that "equal access" to needed medical services could not be provided to all low-income individuals in all geographical areas at the same level as the general population. *See* 42 U.S.C. § 1396a(a)(30).

**4.** Retroactive effect—to "the first day of the quarter," *viz.*, January 1, 1994—is accorded any "*approvable* plan [amendment] ... submitted to [the HCFA] regional office." 42 C.F.R. § 430.20(b) (emphasis added); *see also id.* § 447.256(c).

1444, 1459–62 (D.Mass.1994). The court concluded that these procedural lapses rendered the final class rates invalid, thus obviating any need to determine whether the proposed new methodology or rates reasonably ensured compliance with the substantive requirement—"equal access" to medical care—imposed by section 1396(a)(30). *Id.* at 1462.

Without conceding any procedural lapse, defendants issued another public notice on September 23, 1994, containing a detailed description of the methodology used to calculate the "new" final class rates, which were to take effect on November 1, 1994. In December 1994, defendants filed a second Plan amendment with HCFA ("Amendment 023"), which provided the same level of detail as the September 24, 1994 public notice. Defendants then asked the district court to declare them in compliance with the procedural requirements of section 1396a(a)(30). Then, in April 1995, while Amendments 003 and 023 remained pending, HCFA was notified that defendants wished to revise and update Amendment 003 to include the detailed information contained in Amendment 023. Defendants thus sought to make any HCFA Plan-amendment approval fully retroactive to January 1, 1994, rather than October 1994. *See supra* note 4. Three days later, HCFA approved Amendment 003, as revised, retroactive to January 1, 1994.

The district court entered final judgment, based on four essential holdings. *Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen,* No. 94–10123–NG (D.Mass. June 30, 1995). First, the court reaffirmed its August 1994 declaratory ruling that defendants' initial implementation of the final class rates on January 1, 1994 was invalid for failure to comply with the public notice and Plan amendment requirements of section 1396a(a)(30), and directed entry of its declaratory judgment *nunc pro tunc* (i.e., effective September 30, 1994), the date on which its initial stay of the judgment expired. *Id.,* slip op. at 2. Second, defendants were found to have been in compliance with the section 1396a(a)(30) procedural requirements as of November 1, 1994, after providing detailed descriptions of the new rate-setting methodology in their September 1994 public notice and in Amendment 023. *Id.* Third, the district court ruled that defendants had never violated the section 1396a(a)(30) public notice and Plan amendment requirements relating to their pre-January 1994 imposition of the interim and phase-in rates, presumably because these transitional rates, unlike the final class rates, did not effect a "material" or "significant" change from pre–1991 "cost-based" methods and procedures. *Id.* at 2–3. Finally, the district court dismissed plaintiffs' remaining claims—alleging that the new final class rates violated the substantive requirements of the section 1396a(a)(30) "equal access" clause—since its decision invalidating the rates due to procedural defects rendered further decision on the alleged substantive violations unnecessary. *Id.* at 3.

## II

### DISCUSSION

#### A. Standards of Review

We review the grant of summary judgment *de novo,* to determine whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, as well as any reasonable inferences therefrom, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 544 (1st Cir.), *petition for cert. filed,* 64 U.S.L.W. 3808 (U.S. May 29, 1996) (No. 95–1929).

Normally, we accord plenary review to the district court's statutory and regulatory interpretations. *See Nowd v. Rubin,* 76 F.3d 25, 26 n. 1 (1st Cir.1996). When a federal agency charged with administering a particular program interprets its own enabling statute, however, we engage in a two-tiered review:

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, howev-

er, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation.* Rather, if the statute is silent or ambiguous with respect to a specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Heno v. FDIC,* 20 F.3d 1204, 1208–09 (1st Cir.1994) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)) (emphasis added) ("*Chevron*").

■■■ As a federal agency charged with administering the Medicaid program, *see supra* note 1, HCFA plainly is entitled to *Chevron* deference in its interpretations of the Act and the implementing regulations. *See North Carolina v. United States Dep't of Health and Human* Servs., 999 F.2d 767, 769–70 (4th Cir.1993) (noting that an HCFA interpretation of its own regulations is entitled to "considerable deference"); *Folden v. Washington State Dep't of Social and Health Servs.,* 981 F.2d 1054, 1058 (9th Cir.1992); *Missouri Dep't of Social Servs. v. Sullivan,* 957 F.2d 542, 544 (8th Cir.1992). Indeed, when a federal agency has promulgated and published a regulation pursuant to its own enabling statute, we review its interpretation of that *regulation* under a standard even "more deferential ... than that afforded under *Chevron*" to the agency's interpretation of the Statute. *National Med. Enters. v. Shalala,* 43 F.3d 691, 697 (D.C.Cir.1995); *e.g. Indiana Ass'n of Homes for the Aging, Inc. v. Indiana Office of Medicaid Policy and Planning,* 60 F.3d 262, 266 (7th Cir.1995) (applying heightened deference to HCFA regulations); *see Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (deferring to HHS interpretation of Medicare regulation); *Stinson v. United States,* 508 U.S. 36, 44, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1134–35 (1st Cir.1995); *see also Consarc Corp. v. United States Treasury Dep't,* 71 F.3d 909, 915 (D.C.Cir.1995). "[P]rovided an agency's interpretation of its own regula-

tion does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is *plainly erroneous* or inconsistent with the regulation.'" *Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919 (citation omitted) (emphasis added); *see Loma Linda Univ. v. Schweiker,* 705 F.2d 1123, 1126 (9th Cir.1983) (noting that an HCFA interpretation of its own regulation is entitled to deference "if it is within the range of reasonable meanings the words permit").

## B. *Defendants' Appeal*

Defendants appeal from that portion of the final judgment declaring them in violation of the section 1396a(a)(30) procedural requirements during the period January 1 through October 31, 1994. Defendants claim, alternatively, that (1) the procedural requirements imposed by section 1396a(a)(30) are not enforceable by health care providers, (2) even if enforceable, however, defendants violated neither procedural requirement cited by plaintiffs, (3) the district court abused its discretion in August 1994 by ruling that defendants had violated section 1396a(a)(30), rather than staying the district court proceedings while Amendment 003 remained pending before HCFA, or (4) the declaratory judgment entered by the district court granted retrospective relief barred by the Eleventh Amendment, *see* U.S. Const. amend. XI.

### 1. *Standing: Enforceable Rights*

■■ Section 1983 enables a private action against a State official to vindicate federal statutory rights enforceable by the plaintiff. *See* 42 U.S.C. § 1983; *Albiston v. Maine Comm'r of Human Servs.,* 7 F.3d 258, 261 (1st Cir.1993). Whether section 1396a(a)(30) creates "enforceable" procedural and substantive rights

turns on "whether [it] was intend[ed] to benefit the putative plaintiff[s]." If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is "'too vague and

amorphous' " such that it is " 'beyond the competence of the judiciary to enforce.' " *Wilder*, 496 U.S. at 509, 110 S.Ct. at 2517 (citations omitted).[5]

### a) *Substantive Rights* [6]

■ Section 1396a(a)(30) arguably describes two distinct substantive "equal access" rights: the right to require a State medicaid program to use reimbursement "methods and procedures" which (1) will "safeguard against unnecessary utilization of such [medical] care and services and [ ] assure that payments are consistent with efficiency, economy, and quality of care," and (2) are "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30).

In *Wilder*, the Supreme Court held that comparable provisions of section 1396a(a)(13) ("the Boren Amendment") did create enforceable substantive rights for institutional health care providers. *See Wilder*, 496 U.S. at 520, 110 S.Ct. at 2523. Section 1396a(a)(13) mandates that the State Plan provide:

> (A) for payment ... of the *hospital* services, *nursing facility* services, and services in an *intermediate care facility* for the mentally retarded provided under the plan through the *use of rates* (determined in accordance with methods and standards developed by the State ... ) which the State *finds*, and *makes assurances* satisfactory to the Secretary, are *reasonable* and *adequate* to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care

and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have *reasonable access* ... to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13) (emphasis added).

Every court that has considered whether the *Wilder* rationale likewise applies to the second "equal access" right described in section 1396a(a)(30) has determined that health care providers were intended beneficiaries under both the Boren Amendment and section 1396a(a)(30), since health care providers, as payees, obviously are affected by substantive changes in State reimbursement schemes under Medicaid. *See, e.g., Arkansas Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir.1993); *Sobky v. Smoley*, 855 F.Supp. 1123, 1137–38 (E.D.Cal.1994); *Oklahoma Nursing Home Ass'n v. Demps*, 792 F.Supp. 721, 727 (W.D.Okla.1992); *Illinois Hosp. Ass'n v. Edgar*, 765 F.Supp. 1343, 1348–49 (N.D.Ill.1991). Without citation to supporting authority, defendants nonetheless insist that section 1396(a)(30) and the Boren Amendment are distinguishable.

### i) *Intended Beneficiaries*

The *Wilder* Court reasoned that because the Boren Amendment "establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers ... [in that] [i]t requires a state plan to provide for 'payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan,' " "[t]here can be little doubt that health care providers are the intended beneficiaries."

---

**5.** In January 1996, Congress enacted 42 U.S.C. § 1320a–2 (a Medicaid Act provision will "not [ ] be deemed unenforceable because of its inclusion in a section ... requiring a State plan or specifying the required contents of a State plan"), which overturned, in part, the Supreme Court decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Before § 1320a–2 was enacted, some commentators had suggested that *Suter*'s rationale supplanted the traditional *Wilder* test. *But see, e.g., Albiston*, 7 F.3d at 262–63 (holding that *Suter* did not overturn *Wilder*, but merely superimposed an additional threshold test). Consequently, we assume

that Congress intended that § 1320a–2 serve to resurrect the *Wilder* test, with no *Suter* overlay.

**6.** We address the enforceability of the § 1396a(a)(30) *substantive requirements* as a threshold issue because the district court judgment dismissed plaintiffs' substantive claims, albeit on other grounds. *See infra* Section II. B.2(b). Even though we find those other grounds infirm, we may uphold the district court ruling on any ground supported by the record. *See Four Corners Serv. Station, Inc. v. Mobil Oil Corp.*, 51 F.3d 306, 314 (1st Cir.1995).

*Wilder,* 496 U.S. at 510, 110 S.Ct. at 2517.[7] Defendants argue, however, that unlike the Boren Amendment, section 1396a(a)(30) does not list specific categories of health care providers (e.g., hospitals, nursing facilit[ies], and intermediate care facilit[ies] ), hence it cannot be said that Congress *focused* on providers as section 1396a(a)(30) beneficiaries. We are not persuaded.

The *Wilder* Court first observed that the statute "is phrased in terms benefiting health care *providers,*" and leaves "little doubt that health care *providers* are the intended beneficiaries," then proceeded to *illustrate* how the plain language of the Boren Amendment "establishes a system for reimbursement of providers" through its listing of specific types of health care providers. Nowhere did the Court indicate that the more general term "providers" would not suffice, however, or that a listing of specific types of providers is a *sine qua non* without which a congressional intent to benefit health care providers could not be inferred. As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers—by ensuring adequate reimbursement payment levels—providers are appropriately considered intended beneficiaries. *See Arkansas Med. Soc'y, Inc.,* 6 F.3d at 526.

### (ii) *"Preference" or "Binding Obligation"*

Defendants argue that section 1396a(a)(30) articulates a more discretionary "access" standard than that in the Boren Amendment, and that the additional discretion thus conferred belies a congressional intendment to lay down any "binding obligations" on the State in section 1396(a)(30). *See Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517. As defendants see it, the Boren Amendment (1) requires the State not only to meet the ultimate benchmark of providing comparable "access" to medical care, but also the preliminary obligation to make "findings" and "assurances," satisfactory to the Secretary, that

State reimbursement rates can ensure reasonable and adequate access, as well as comply with "State and Federal laws, regulations, and quality and safety standards," and (2) limits the potential reimbursement methods and procedures that the State can employ to the institution of "rates," rather than permitting more innovative or *ad hoc* reimbursement systems that might be less rate-dependent. We find no indication that the *Wilder* holding turned on these considerations.

First and foremost, the Boren Amendment and section 1396a(a)(30) are prefaced with the same mandatory language—"[a] State plan for medical assistance *must* ... [p]rovide," 42 U.S.C. § 1396a; *see Edgar,* 765 F.Supp. at 1349—and the "reasonable" and "equal" access requirements upon which federal Medicaid funding depends, *see* 42 U.S.C. § 1396c, are conditions precedent to an approvable State Plan. *See Wilder,* 496 U.S. at 511, 110 S.Ct. at 2518 (contrasting with statute in *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 24, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981), where hortatory language did not make "compliance with the provision a condition of receipt of federal funding"); *Arkansas Med. Soc'y, Inc.,* 6 F.3d at 526; *see also supra* note 5 (discussing newly enacted 42 U.S.C. § 1320a–2). Thus, the mandatory language in section 1396a(a) defies fair characterization as a mere "congressional preference."

Second, the majority opinion in *Wilder* mentioned the Boren Amendment requirement that there be "findings" and "assurances" merely to rebut a suggestion in the *Wilder* dissent that Congress had intended to accord plaintiffs standing to assert a judicial challenge to a State's default on these two procedural obligations, but not to challenge a substantive default (i.e., a State's adoption of rates that do not ensure "reasonable access," or that are not "adequate" to compensate "efficient[ ]" provider costs). *See Wilder,* 496

---

7. Although Medicaid recipients also are intended beneficiaries under the "equal access" requirement as it affects the availability of their medical care, it is well settled that Congress may create more than one class of intended beneficiary. *See Freestone v. Cowan,* 68 F.3d 1141, 1150 n. 10

(9th Cir.1995) (citing *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110, 110 S.Ct. 444, 450–51, 107 L.Ed.2d 420 (1989); *Carelli v. Howser,* 923 F.2d 1208, 1211 (6th Cir. 1991)).

U.S. at 514, 110 S.Ct. at 2519–20 ("We reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless [since] . . . [i]t would make little sense for Congress to require a State to make findings without requiring those findings to be correct."). The premise that procedural rights normally exist only as aids to the enforcement of substantive rights is not interchangeable with the proposition that substantive rights cannot exist absent an express provision of attendant procedural rights. Thus, the majority opinion in *Wilder* in no sense suggests that the Boren Amendment's substantive "access" requirement would have been found any less mandatory if, like section 1396a(a)(30), it had contained no explicit procedural requirement of "findings" and "assurances."

### iii) *Judicial Enforceability*

Defendants intimate, however, that absent any requirement of "findings" and "assurances," section 1396a(a)(30) is less amenable to effective judicial enforcement than the Boren Amendment. As we have explained, however, substantive requirements are not "impermissibly vague simply because [they] require[ ] judicial inquiry into 'reasonableness,'" or "adequate rates," as long as "the action or purpose whose 'reasonableness' [or 'adequacy'] is commanded has been clearly delineated and is susceptible of judicial ascertainment." *Albiston,* 7 F.3d at 267 (collecting cases).

The Boren Amendment and section 1396a(a)(30) contain nearly identical substantive requirements that the rates, or methods and procedures, used to determine reimbursements to health care providers ultimately ensure reasonable, adequate or equal "access" to medical care, which the Supreme Court in *Wilder* decided did *not* constitute a standard too vague or amorphous for judicial

enforcement. *See Wilder,* 496 U.S. at 515, 110 S.Ct. at 2520 ("[T]he statute imposes the concomitant obligation to adopt reasonable and adequate rates."). Indeed, the term "equal access," as employed in section 1396a(a)(30), arguably provides a more concrete standard, objectively measurable against the health care access afforded among the general population, whereas the Boren Amendment employs the somewhat less objective benchmark: "reasonable" access.

Nor do we discern a material distinction between the focus on "methods and procedures" required by section 1396(a)(30) and the focus on "rates" required by the Boren Amendment. In either instance, the required determination—as to whether the State methods or procedures, or the resultant rates of reimbursement, are adequate to ensure "access"—is neither more nor less daunting a judicial task. *See id.* at 519, 110 S.Ct. at 2522 (noting that although States have great flexibility in choosing among a broad "range of reasonable rates," "the statute and regulation[s] set out factors which a State must consider in adopting its rates," so that "there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act.").[8]

For the foregoing reasons, therefore, we conclude that plaintiffs possess standing to enforce the substantive section 1396a(a)(30) requirement that the State adopt "methods and procedures" which will afford "equal access" to medical care as defined in section 1396a(a)(30).

### b) *Procedural Rights*

Plaintiffs further contend that section 1396a(a)(30), as interpreted and applied through the HCFA implementing regulations, establishes two coincident procedural requirements designed to ensure that health

---

**8.** We reject the implicit suggestion by defendants that the absence of a "findings" and "assurances" requirement under § 1396a(a)(30) makes meaningful judicial review wholly impracticable in that the courts have no factual bases for ascertaining whether the State's chosen "methods and procedures" satisfy the substantive "equal access" requirement. Setting aside the question whether the § 1396a(a)(30) implementing regula-

tions afford any procedural rights that ensure disclosure, *see infra* Section II.B.2(a), plaintiffs may adduce evidence concerning the inadequacy of the State's selected methods and procedures, or flaws in the State's substantive decisionmaking processes, in any number of ways; for example, with information acquired by or from the State during public hearings, in proposed Plan changes, or in the published State regulations.

care providers may enforce the substantive right of "equal access": the requirements that the State file a Plan amendment and a public notice "describing" its proposed new "methods and procedures" in some detail. Since we conclude that defendants have not violated these procedural requirements, *see infra* Section II.B.2(a), we need not reach the enforceability issue.[9]

## 2. *Claimed Violations of Enforceable Rights*

### a) *Procedural Rights*

#### i) *Plan Amendment 003*

Prior to the time Amendment 003 was submitted to HCFA in March 1994, the approved Massachusetts Plan described its "methods and procedures" for reimbursing providers as "fixed negotiated fee schedules." Amendment 003 purportedly altered the "methods and procedures" to be employed under the new class rate system simply by deleting the word "negotiated," with the result that the new rates were to be based on "fixed fee schedules."

Plaintiffs argue that the cryptic phrase "fixed fee schedules" is patently deficient to describe the proposed change in the Massachusetts reimbursement "methods and procedures," and that under whatever conceivable definition the phrase might be given, it utterly failed to notify HCFA or plaintiffs that defendants planned to change from a cost-based system to a class rate system, or to explain with any precision the methodology or formula defendants used to arrive at the bottom-line reimbursement figures announced in the DMA regulation. *See* Mass. Regs.Code tit. 114.3, § 3.04(4). We do not agree.

First, HCFA itself implicitly determined that the phrase "fixed fee schedules" met the section 1396a(a)(30) mandate, otherwise it could not have approved Amendment 003

*retroactive to January 1, 1994. See supra* note 4. In order to be entitled to retroactive effect to January 1, 1994, Plan amendment 003 had to have been "approvable" *as submitted in March 1994*, when it contained merely the three-word description presently challenged by plaintiffs as insufficient to satisfy section 1396a(a)(30).[10] We must therefore review the implicit interpretation given section 1396a(a)(30) by HCFA in this case.

At its initial stage, *Chevron* review accords no deference to the interpretation an agency gives to its enabling statute. *See supra* Section II.A. If the reviewing court independently determines that the intent of the statute is clear, as disclosed in its plain language and design, the statutory language is to be given full effect. *See Grunbeck v. Dime Sav. Bank of N.Y., FSB,* 74 F.3d 331, 340–41 (1st Cir.1996); *Strickland v. Commissioner of Me. Dep't of Human Servs.,* 48 F.3d 12, 16–17 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995).

Section 1396a(a)(30) mandates that a State Plan provide "methods and procedures relating to . . . the payment for [ ] [medical] care and services." Plaintiffs argue that "methods" has a plain or acquired meaning that necessitates disclosure of the formula the State used to arrive at its proposed bottom-line reimbursement figures. Thus, plaintiffs suggest that the solitary statutory term "rates" might permit a Plan amendment to list only bottom-line figures, *cf.* 42 U.S.C. § 1396a(a)(13), but that the presence of the term "methods" forecloses such an approach. Once again, we are unable to agree.

Even if the distinction suggested by plaintiffs were deemed sound, the question would remain: with what degree of specificity or detail must a State describe the methodology used in its Plan amendment? In this case, for example, although nonexhaustive, the

---

**9.** We likewise reserve judgment as to whether, and what extent, procedural rights prescribed only in the implementing regulations, rather than directly by statute, may be enforced in a § 1983 action. *See, e.g., Oklahoma Nursing Home Ass'n,* 792 F.Supp. at 725–26.

**10.** Thus viewed, the HCFA interpretation comports with 42 C.F.R. § 430.16(a)(1)(ii), which

empowers HCFA to ask the State for any "additional information" the agency needs to conduct its "final [approval] determination." On the other hand, if the requested "additional information" were a necessary part of the initial submission by the State, and hence of its Plan, Amendment 003 would only have been retroactive to January *1995. See supra* p. 1001.

terms "cost-based" and "class rates" assuredly are to some degree descriptive of the proposed change in methodology, particularly among the initiated, *viz.*, health care providers. Yet we are unable to say that section 1396a(a)(30) defines, in plain language, the term "methods and procedures," nor, more importantly, that it prescribes the level of detail with which a Plan must describe "methods and procedures." Unlike the Boren Amendment, moreover, section 1396a(a)(30) does not require the State to make "findings" and "assurances," a requirement that arguably might be thought to anticipate a somewhat greater degree of detail and specificity from a Plan's description. As we are unable to discern either a "plain language" meaning or design in section 1396a(a)(30) relating to "the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781—i.e., the degree of specificity required in a Plan amendment description of proposed new "methods and procedures"— we next turn to defendants' contention that Congress meant to leave this matter for determination by HCFA, the administering agency.[11]

▓▓ The second stage in the *Chevron* analysis counsels "a high degree of respect for the agency's role" in administering its enabling statute. *See Strickland,* 48 F.3d at 17 ("The agency need not write a rule that serves the statute in the best or most logical manner; it need only write a rule that flows rationally from a permissible construction of the statute.") *see Lamore v. Ives,* 977 F.2d 713, 718 (1st Cir.1992); *accord Caribbean Petroleum Corp. v. United States EPA,* 28 F.3d 232, 234 (1st Cir.1994); *Cabral v. INS,* 15 F.3d 193, 194 (1st Cir.1994) (agency interpretation "is entitled to deference unless arbitrary, capricious, or manifestly contrary to the statute"). As a general rule, longstanding agency interpretations are entitled to greater deference than more recent ones. *See Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 646 n. 34, 106 S.Ct. 2101, 2122 n. 34, 90 L.Ed.2d 584 (1986); *Mayburg v. Secretary of Health and Human Servs.,* 740 F.2d 100, 106 (1st Cir.1984). Further, the more persuasive the rationale for an agency interpre-

tation, the more deference it is due, especially if the statute administered by the agency involves complex questions peculiarly within the agency's acquired, technical, or institutional expertise. *Bowen,* 476 U.S. at 646, 106 S.Ct. at 2122–23.

▓▓ Plaintiffs stress that these HCFA regulations describe a State Plan as a "*comprehensive* written statement," 42 C.F.R. § 430.10 (emphasis added), which must (i) "contain[ ] all information necessary for HCFA to determine whether the plan [or plan amendment] can be approved to serve as a basis for Federal financial participation (FFP) in the State program," *id.,* and (ii) "describe the policy and the methods to be used in setting payment rates for each type of service included in the State's Medicaid program," *id.* § 447.201. Although these HCFA regulations are not facially inconsistent with section 1396a(a)(30), neither do they expressly resolve the ambiguity inherent in the statute.

Contrary to plaintiffs' assertion, the section 430.10 reference to comprehensiveness accurately describes the State Plan, even under the minimalist interpretation given the term "description" by defendants and HCFA, since we think one cannot rationally contend that a State Plan itself, which must cover no less than *sixty-two* different criteria, *see* 42 U.S.C. § 1396a(a)(1)-(62), is not a "comprehensive" document. For this reason and because HCFA's regulations do not prescribe the level of specificity and comprehensiveness with which "methods and procedures" must be described in a Plan, we must consider the implicit interpretation HCFA has given its own regulations.

Plaintiffs concede that the initial Massachusetts Plan approved by HCFA had been in existence for years, yet it contained only a bare-bones, four-word description of its "methods and procedures." When Massachusetts decided in 1991 to effect a material change in its rate-setting system, from a cost-based to a class-rate system, it reasonably understood that HCFA had interpreted

---

**11.** Plaintiffs do not claim that the available legislative history provides useful guidance. *See Strickland,* 48 F.3d at 17 (stating that reviewing court may "examine the legislative history, albeit skeptically, in search of an unmistakable expression of congressional intent").

its own implementing regulations to require no *greater* degree of specificity in the Amended Plan's description of reimbursement rates than that provided in the initial Massachusetts Plan, which had gone unchallenged for many years. *See Bowen,* 476 U.S. at 646 n. 34, 106 S.Ct. at 2122 n. 34; *Lynch v. Dawson,* 820 F.2d 1014, 1020 (9th Cir.1987) (agency's interpretation of regulation is accorded various degrees of deference based on duration and consistency of agency position).

Plaintiffs correctly contend, of course, that this longstanding HCFA interpretation does not foreclose a federal court from determining whether the interpretation an agency has given its own regulations rationally comports with the statutory and regulatory language. Nevertheless, their argument seriously devalues the heightened *Chevron* judicial deference reaffirmed in *Stinson,* which requires the reviewing court to decide whether the agency's interpretation of its own regulation is *"plainly erroneous* or inconsistent with the regulation." *Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919 (emphasis added).

Since sections 430.10 and 447.201, like section 1396a(a)(30) itself, do not preclude the interpretation implicitly given them by HCFA, we may not second-guess its reasonable policy judgment. *See Bowen,* 476 U.S. at 646, 106 S.Ct. at 2122–23; *Massachusetts Fed'n of Nursing Homes v. Commonwealth of Mass.,* 772 F.Supp. 31, 39 (D.Mass.1991) ("The HCFA certainly has more expertise in this complicated area of the law than the courts."). And because plaintiffs have not chosen to join HCFA as a party defendant, *see* 42 U.S.C. § 1396c, we can only infer the rationale for HCFA's longstanding practice from its prior approval of Amendment 003 and its predecessor. Moreover, we find readily apparent a sound policy reason for the HCFA's action.

The Medicaid Act designedly affords States considerable flexibility in administering their respective Medicaid programs, allowing each to devise and modify its Plan in response to prevailing local medical and financial conditions. Once the sixty-two statutory minima in section 1396a(a) are met, each participating State has "wide discretion in administering its local program." *See, e.g.,*

*Erie County Geriatric Ctr. v. Sullivan,* 952 F.2d 71, 73–74 (3d Cir.1991); *Lewis v. Hegstrom,* 767 F.2d 1371, 1373 (9th Cir.1985). HCFA's regulatory interpretation—permitting terse descriptions of "methods and procedures," such as "cost-based" or "class rate"—arguably serves this salutary goal as well. Mandating the inclusion of a detailed formula in the State Plan itself could require a State to file a new Plan amendment each time it needed to alter *any* significant integer in its formula, thereby imposing a cumbersome administrative burden on the State as well as HCFA. Thus, whatever one might think of its wisdom, we cannot say that the implicit policy choice made by HCFA was precluded, either by the statute or HCFA regulations. *See Massachusetts Fed'n of Nursing Homes,* 772 F.Supp. at 39 (noting that HCFA approval of Plan, unless inconsistent with the statute or regulation, implicitly establishes definition of comprehensiveness of the term "methods and procedures" as a matter of law).

■ Nor do we think the agency decision approving defendants' description of the new class rate system—as one utilizing "fixed fee schedules"—was impermissible, given the original Massachusetts Plan's longstanding description of its provider-cost-based system as a "negotiated fixed fee schedule." HCFA fairly and sensibly reasoned that deletion of the term "negotiated" signified clearly enough that individual providers no longer would be entitled to reimbursement rates set according to their idiosyncratic cost experiences, but would be confined for the most part to across-the-board "fixed" rates established for services rendered in each of the five covered health service classifications. Accordingly, as the longstanding interpretation reflected in the HCFA regulations was not plainly erroneous, defendants were entitled to place reasonable reliance on HCFA's interpretation in preparing and submitting their March 1994 Plan Amendment 003. *Cf. Sekula v. FDIC,* 39 F.3d 448, 457 (3d Cir. 1994) ("[A] person 'proceeding in good faith should not be subjected to a trap brought about by an interpretation of a regulation hidden in the bosom of the agency' .... [b]ut there is no 'trap' when the agency's interpre-

tation of a regulation is public and long-standing.") (citation omitted).

## ii) *Public Notice Under Section 447.205*

■ Plaintiffs next contend that the HCFA regulations mandate that the public notices issued by the State relating to reimbursement rate changes likewise contain a complete description of the proposed change in methodology. Section 447.205 provides, in pertinent part:

(a) When notice is required. Except as specified in paragraph (b) of this section, the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services....

. . . .

(c) Content of notice. The notice must—

(1) Describe the proposed change in methods and standards;

(2) Give an estimate of any expected increase or decrease in annual aggregate expenditures;

(3) Explain why the agency is changing its methods and standards;

(4) Identify a local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;

(5) Give an address where written comments may be sent and reviewed by the public; and

(6) If there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.

42 C.F.R. § 447.205.

Defendants respond that section 447.205 was complied with because the representative public notice hereinafter quoted explained "why DMA is changing its methods and standards," i.e., "to implement a class rate system by eliminating many of the idio-syncratic adjustments that existed previously [under the cost-based rate setting system]":

The proposed amendments do not change the existing methodology from July 1, 1992—December 31, 1992 except for a provision to allow some eligible providers to request rate reviews based on their cost report, with inflation equal to 1.0. Effective January 1, 1992, the proposed amendments change the structure of the reimbursement methodology to a *class rate system:* establishing new criteria for administrative adjustments; eliminating, among other things, costs beyond agency control, management initiatives, program innovation rate adjustments, and appeals sections of the regulation. It is estimated that the proposed amendments will increase program expenditures by the Department of Public Welfare by approximately $335,000. (Emphasis added.)

For the reasons discussed in Section II. B.2.(a)(i), *supra,* we believe the public notices issued by defendants need not have "describ[ed]" the proposed changes in greater detail than that provided in Plan Amendment 003. Absent a reliable indication to the contrary, we must assume that HCFA construes the term "describe" in section 447.205(c)(1) as it interprets the same term in 42 C.F.R. § 447.201 (providing that Plan amendment "must describe the policy and methods to be used in setting payment rates for each type of service included in the state's Medicaid program"). *Cf. Gustafson v. Alloyd Co.,* —— U.S. ——, ——, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995) (noting presumption that a word or phrase used more than once in a statute is intended to have the same meaning); *United States v. Rhode Island Insurers' Insolvency Fund,* 80 F.3d 616, 622 n. 4 (1st Cir.1996).[12]

■ Plaintiffs complain that interested parties cannot know whether proposed changes in methodology threaten their substantive rights under section 1396a(a)(30) unless the public notice is sufficiently infor-

---

12. The only case remotely on point, *see Methodist Hosps. v. Indiana Family and Social Servs.,* 860 F.Supp. 1309, 1326–28 (N.D.Ind.1994), does not undercut HCFA's interpretation. Although the notice involved in that case contained greater detail than these notices, the court found the notice adequate, not inadequate. Consequently, the case is not particularly instructive as to how much less detail might have been considered permissible.

mative. As their name suggests, however, "notice" provisions are neither invariably nor primarily designed to afford exhaustive disclosure, but to alert interested parties that their substantive rights may be affected in a forthcoming public proceeding. *See Mississippi Hosp. Ass'n v. Heckler,* 701 F.2d 511, 520 (5th Cir.1983) (noting that notice is designed to "outline[ ] the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects"); *see also* 42 C.F.R. § 447.205(c)(4), (6) (mandating the provision of information to allow interested parties to initiate follow-up after § 447.205 notice). Accordingly, HCFA might reasonably anticipate that the State would provide more detailed information, relating to its methodology, at the public hearings, especially since it is in the State's interest to respond to reasonable requests for further information at the public hearings, if for no other reason than to forfend a future section 1983 action by disgruntled health care providers. *See supra* note 8 (describing potential discovery burdens facing the State in § 1983 action). Thus, HCFA's interpretation cannot be

characterized as either plainly erroneous or inconsistent with the Medicaid statute.[13]

Since defendants violated neither procedural requirement established in section 1396a(a)(30), we do not reach defendants' two remaining arguments—i.e., whether the district court erred in refusing to stay its partial summary judgment while Amendment 003 remained pending before HCFA, and whether the district court's declaratory judgment constituted retrospective relief barred by the Eleventh Amendment.[14]

**b) *Substantive Right to "Equal Access"***

The district court first dismissed plaintiffs' substantive claims on the mistaken ground that plaintiffs had stipulated to their dismissal. Upon reconsideration, the court again dismissed the substantive claims, apparently because its decision on the procedural claims had rendered their resolution unnecessary. Insofar as the district court meant to suggest that defendants' procedural violations from January to October, 1994, were sufficient in themselves to invalidate the final class rates during the January–October 1994 period, without regard to whether the rates violated plaintiffs' substantive "equal access" rights,

---

13. Since the public notices complied with § 447.205, we need not determine whether plaintiffs acquired *actual* notice during the two and a half years of public consultative hearings and meetings, or whether any such actual notice might excuse the alleged procedural default under § 447.205. *See North Carolina Dep't of Human Resources,* 999 F.2d at 771 (finding that actual notice did not cure procedural default).

14. Plaintiffs urge us to affirm the district court on another ground. *See Four Corners Serv. Station, Inc.,* 51 F.3d at 314. Before implementing the final class rates in January 1994, defendants failed to consult with the medical care advisory committee (MCAC), appointed by the Massachusetts Medicaid director to represent, *inter alios,* consumer groups, Medicaid recipients, and health care providers specializing in low-income medical services. *See* 42 U.S.C. § 1396a(a)(4); 42 C.F.R. § 431.12(e). We decline plaintiffs' request.

The alleged MCAC violation was first raised in the amended complaint filed in September 1994. The State subsequently reconvened a MCAC, with which it consulted regarding the final rates. The § 431.12(e) case law suggests that States should undertake their MCAC consultations as early in the Plan amendment process as practicable, preferably before any final decision on pro-

posed changes to their reimbursement methodologies. *See Morabito v. Blum,* 528 F.Supp. 252, 264 (S.D.N.Y.1981) (collecting cases). Nonetheless, the Medicaid Act contains no express requirement that a State establish a MCAC, *see* 42 U.S.C. § 1396a(a)(4), an entity entirely the creature of the HCFA implementing regulations. *See Morabito,* 528 F.Supp. at 264. Further, the HCFA regulations prescribe no time bar for the recommended MCAC consultation. Thus, HCFA might reasonably conclude that (1) a State's failure to consult an MCAC, while not the preferred practice, does not constitute a sufficient ground for disapproving a Plan amendment in all circumstances, or (2) MCAC consultation is sufficient as along as it occurs before final HCFA approval of the Plan amendment. Given that the MCAC is a purely advisory body, with no veto power over the State's decisions, *see Burgess v. Affleck,* 683 F.2d 596, 600 (1st Cir.1982) (upholding district court's refusal to enjoin implementation of rates for alleged MCAC violation which was not "egregious"); *cf. Mississippi Hosp. Ass'n, Inc.,* 701 F.2d at 523 (noting court's reluctance to "read more into [§ 431.12(e) ] than is clearly expressed," where "the federal agency whose own regulation is in question has approved the state's actions"), this interpretation is neither plainly erroneous nor inconsistent with § 1396a(a)(4).

its dismissal order cannot stand. *See supra* Section II.B.2(a). Since we have concluded that the State was in full procedural compliance, plaintiffs must now adduce evidence that (1) the methods and procedures adopted by the State were inadequate to ensure "equal access," or (2) the bottom-line reimbursement figures derived under that methodology were too low to retain health care providers in the Massachusetts Medicaid program. *See supra* note 8. Conversely, if the district court meant to suggest that judicial resolution of plaintiffs' substantive claims was unnecessary because HCFA has already approved Amendment 003 retroactive to January 1, 1994, we cannot agree. HCFA's approval of the State's proposed methods and procedures (i.e., "class rates"), though arguably entitled to the customary level of *Chevron* deference, are not automatically conclusive at the summary judgment stage. Further, the as-yet undeveloped factual record relating to plaintiffs' substantive claims does not reveal HCFA's rationale for approving the substantive terms of defendants' Plan amendment, or whether the final class rates have the actual effect of creating "unequal access" to medical services.

### C. Plaintiffs' Cross–Appeal

Plaintiffs cross-appeal from the district court rulings that (1) defendants were in compliance with the section 1396a(a)(30) procedural requirements as of November 1, 1994, and (2) defendants did not violate the procedural requirements by instituting their interim and phase-in rates. Although the district court did not reveal the rationale for the latter holding, we presume that it found that the transitional rate methodologies had not effected a "material" or "significant" change from the pre–1991 methodologies. In light of our previous holding, *see supra* Section II.B., we deny plaintiffs' cross-appeal on both fronts.

■ First, if defendants complied with the putative procedural requirements in filing Amendment 003 and publishing their pre-January 1994 notices, it necessarily follows that their filing of the more detailed Amendment 023 and their post-October 1994 notices likewise would comply with the procedural thresholds prescribed by the HCFA regulations. Second, since we conclude, on the specific facts of this case, that deference is due HCFA's conclusion that a "description" of "methods and procedures" is adequate as long as it differentiates between a cost-based rate and a class rate system, we affirm the district court's finding that the interim and phase-in rates, which retained some aspects of the pre–1991 "cost-based" or "negotiated" rate systems, did not represent a cognizable change in the methods and procedures such as necessitated a Plan amendment or public notice.

## III

### *CONCLUSION*

To the extent section 1396a(a)(30) might create the purported procedural rights advocated by plaintiffs, *Chevron* deference is due HCFA's longstanding statutory and regulative interpretation that a State sufficiently describes its cost-based system as a "fixed negotiated fee schedule," and its proposed class rate system as "fixed fee schedules." We therefore reverse the district court ruling that defendants were in violation of section 1396a(a)(30)'s procedural requirements from January 1 to October 31, 1994. We likewise affirm the two district court rulings challenged in plaintiffs' cross-appeal. Finally, because summary judgment was improvidently granted on plaintiff's procedural claims, the district court ruling that no disposition was necessary on plaintiffs' substantive claims was in error.

Accordingly, the district court judgment for plaintiffs on their procedural claims is vacated and the case is remanded to the district court for further proceedings on plaintiffs' substantive claims, consistent with this opinion.

*SO ORDERED. The parties shall bear their own costs.*