OPINION OF THE COURT
ALITO, Circuit Judge,
with whom Judges NYGAARD, ROTH, BARRY, AMBRO and FUENTES join.
The Pennsylvania Pharmacists’ Association [1] and 16 pharmacies operating in southeastern Pennsylvania brought this action under 42 U.S.C. § 1983 against Feather 0. Houstoun, the Secretary of the Pennsylvania Department of Public Welfare (the “Department”), to challenge the reimbursement rates paid to pharmacies under Pennsylvania’s Medicaid program. The plaintiffs claimed that the Department, in administering its HealthChoices Southeast program (“HealthChoices”), was violating provisions of Title XIX of the Social Security Act (the “Medicaid Act”), 42 U.S.C. §§ 1396a(a)-1396v. The plaintiffs’ principal claim was based on 42 U.S.C. § 1396a(30)(A) (“Section 30(A)”). In ac *533 cordance with its interpretation of prior circuit precedent, the District Court held that the plaintiffs could assert their Section 30(A) claim under § 1983, but the District Court nevertheless granted summary judgment against the plaintiffs. We now hold that the plaintiffs, as Medicaid providers, may not assert their claims under § 1983, and we therefore affirm the order of the District Court on this alternative ground.
I.
Medicaid is a cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons. See 42 U.S.C. § 1396; Rite Aid of Pennsylvania, Inc. v. Houstoun, 171 F.3d 842, 845 (3d Cir.1999). If a state chooses to participate in the program, it must comply with the Medicaid Act and implementing regulations promulgated by the Secretary of Health and Human Services (“HHS”). See Wilder v. Virginia Hasp. Ass’n., 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). In order to participate, a state must submit a medical assistance plan to the Secretary of HHS and obtain approval of the plan. See 42 U.S.C. § 1396; 42 C.F.R. § 430.10 (2001). With further administrative approval, a state may amend a previously approved plan. See 42 C.F.R. § 430.12 (2001).
Under the Medicaid Act, a state is required to pay for certain enumerated services and may choose to pay for certain additional services. 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.210 (2001). Pennsylvania includes prescription drugs among its optional services. See 42 U.S.C. § 1396d(a)(12); 42 C.F.R. § 440.120(a) (2001).
Until 1997, Pennsylvania compensated participating pharmacists directly under a “fee-for-service” program. Payments to these pharmacies generally consisted of two components: (1) ingredient cost reimbursement and (2) a dispensing fee. Pharmacies were compensated for brand-name drugs based on the “estimated acquisition cost” of the drugs[2] plus a “reasonable” dispensing fee. See 42 U.S.C. § 1396(a)(30)(A); 42 C.F.R. § 447.300 et seq. Pharmacists were compensated for generic drugs using acquisition cost limits established by HHS plus a reasonable dispensing fee.
In 1997, the Pennsylvania Department of Public Welfare began to implement its HealthChoices program, a mandatory managed care program operated in five counties in the southeastern part of the state pursuant to an HFCA waiver from certain provisions of the Medicaid Act.[3] The Department contracted with four health management organizations (“HMOs”) to administer HealthChoices. Three of the four HMOs administer pharmacy benefits through contracts with pharmacy benefits managers. When an HMO contracts with a pharmacy benefits manager, the HMO and the pharmacy benefits manager set the rates at which pharmacies are reimbursed. The pharmacy benefits manager then contracts directly with the participating pharmacies to provide outpatient pharmacy services to eligible beneficiaries.
*534 In order to participate in HealthChoices, the named pharmacy plaintiffs entered into standardized Medical Assistance Provider Agreements with the Department. The Agreements cover the provision of brand-name and generic prescription drugs to eligible beneficiaries and obligate the Department to reimburse the contracting pharmacies in accordance with state and federal law.
In January 1999, the plaintiffs commenced this action in the United States District Court for the Eastern District of Pennsylvania and requested declaratory and injunctive relief. The plaintiffs’ principal claim was that the new payment rates violate Section 30(A), which requires a state Medicaid plan to assure that payments “are consistent with efficiency, economy, and quality of care” and “are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.” The plaintiffs alleged that the pharmacy benefits managers, without oversight from the Department, had decreased the outpatient pharmacy benefit rates so much that they were below the cost of acquiring and dispensing the drugs.
The District Court certified a class of pharmacy plaintiffs and denied the Department’s motion to dismiss the complaint, holding that the plaintiffs had “a private right to enforce [Section 30(A)].” Pennsylvania Pharmacists Ass’n v. Houstoun, No. CIV.A. 99-491 (E.D.Pa. October 21, 1999). As support for its holding on this point, the Court cited a footnote in a prior panel opinion of this Court. See Rite Aid of Pennsylvania, Inc. v. Houstoun, 171 F.3d 842, 850 n. 7 (3d Cir.1999).
The District Court subsequently granted the defendant’s motion for summary judgment. Pennsylvania Pharmacists Ass’n v. Houstoun, No. CIV.A. 99-491, 2000 WL 730344, at * 1 (E.D.Pa. June 7, 2000). The Court held that the Department, in implementing its new program, had properly considered efficiency, economy, and access to quality pharmacy services, that its procedures were neither arbitrary nor capricious, and that the resulting payment rates did not violate Section 30(A). Pennsylvania Pharmacists Ass’n, 2000 WL 730344, at * 3-5.
The Plaintiffs appealed, and their arguments were heard before a regular panel. Under a longstanding practice of our Court, a panel may not overrule another panel decision. A footnote in the panel opinion in Rite Aid appeared to hold that a provider may assert a Section 30(A) claim under § 1983, but the footnote provided no elaboration.[4] By the time of the panel argument in this case, the other courts of appeals were divided on this issue. Prior to the issuance of a panel decision, we granted rehearing en banc primarily for the purpose of considering the § 1983 issue.
II.
The threshold issue that we must consider is whether the plaintiffs, as Medicaid providers (as opposed to Medicaid recipients), may assert a Section 30(A) claim under 42 U.S.C. § 1983. Section 1983 provides a private right of action against any person who, acting under the color of *535 state or territorial law, abridges “rights, privileges, or immunities secured by the Constitution and laws” of the United States. See also Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In order to seek redress under § 1983, a plaintiff “must assert the violation of a federal right,” and not merely a violation of federal law. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). Thus, a plaintiff alleging a violation of a federal statute may not proceed under § 1983 unless 1) the statute creates “enforceable rights, privileges, or immunities within the meaning of § 1983” and 2) Congress has not “foreclosed such enforcement of the statute in the enactment itself.” Wright v. Roanoke Redevelopment and Housing Auth., 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).
In considering the first of these requirements — that the statute must create an enforceable right, privilege, or immunity — we must determine whether the three conditions identified by the Supreme Court in Wilder and Blessing v. Freestone, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), are satisfied. First, the provision in question must have been “intend[ed] to benefit the putative plaintiff.” Wilder, 496 U.S. at 509, 110 S.Ct. 2510 (quoting Golden State Transit Corp., 493 U.S. at 106, 110 S.Ct. 444)(brackets added in Wilder); see also Blessing, 520 U.S. at 340, 117 S.Ct. 1353. Second, the right allegedly protected by the statute must not be so “vague and amorphous” that its enforcement would strain judicial competence. Blessing, 520 U.S. at 340-41, 117 S.Ct. 1353; Wilder, 496 U.S. at 509, 110 S.Ct. 2510. Finally, the statute must unambiguously impose a binding obligation on the states, id., and thus the provision giving rise to the asserted right must be couched in “mandatory, rather than preca-tory, terms.” Blessing, 520 U.S. at 341, 117 S.Ct. 1353.
Once these requirements are satisfied- — and the existence of a federal right is established — a rebuttable presumption arises that the right is enforceable under § 1983. Blessing, 520 U.S. at 341, 117 S.Ct. 1353. This presumption may be rebutted by showing that Congress expressly or impliedly foreclosed an action under § 1983. Id.; see also Livadas v. Bradshaw, 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994).
III.
A.
In the present case, the focus of our inquiry is the requirement that the provision in question must have been intended to benefit the plaintiffs. Blessing, 520 U.S. at 340, 117 S.Ct. 1353; Wilder, 496 U.S. at 509, 110 S.Ct. 2510; Golden State Transit Corp., 493 U.S. at 106, 110 S.Ct. 444; Wright, 479 U.S. at 430, 107 S.Ct. 766. It is important to keep in mind that the question whether a statute is intended to benefit particular plaintiffs is quite different from the question whether the statute in fact benefits those plaintiffs[5] *536 or even whether Congress knew that the statute would benefit those plaintiffs. In the present case, it may well be that Section 30(A) in fact benefits pharmacies in some states and that Congress realized this in enacting that provision. For example, if Section 30(A) were not on the books, a state plan might provide lesser access to pharmacy services than Section 30(A) requires. In any such state, Section 30(A) presumably has the effect of increasing drug sales, and these increased drug sales presumably benefit pharmacies — as well as drug wholesalers, drug manufacturers, many other businesses {e.g., lessors of pharmacy premises, cleaning service firms retained by pharmacies, trash collection companies retained by pharmacies, private security firms retained by pharmacies), employees of all of these businesses, etc. Congress undoubtedly realizes that federal subsidies have such ripple effects, but it would be outlandish to argue that the Wilder/Blessing intended-to-benefit requirement permits all of these businesses and individuals to assert Section 30(A) claims in federal court. Our inquiry, consequently, is quite narrow: did Congress, in enacting Section 30(A), intend to benefit providers?
In attempting to answer this question, the Supreme Court has instructed us to pay careful attention to the way in which the statutory provision at issue is framed. In Cannon v. University of Chicago, 441 U.S. 677, 689, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court wrote that the question whether a statute is enacted for the benefit of a particular class of plaintiffs “is answered by looking to the language of the statute itself.” The Court noted the importance of any “right- or duty-creating language” in the statute. Id. at 690 n. 13, 99 S.Ct. 1946. Moreover, in holding that the statute in that case was intended to benefit the plaintiffs, the Court observed that the statute was “phrased in terms of the persons benefited” and was “draft[ed] ... with an unmistakable focus on the benefited class.” Id. at 691, 692 n. 13, 99 S.Ct. 1946. More recently, in Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 1520, 149 L.Ed.2d 517 (2001), the Court again commented on the importance of the particular phrasing of a statute in this regard.
While Cannon and Alexander concerned the implication of a private right of action under a statute, rather than the assertion of a statutory claim under § 1983, the tests applied in these contexts partially overlap,[6] and both tests ask whether the statute at issue was intended to benefit the putative plaintiff or plaintiffs. See Wright, 479 U.S. at 432-33, 107 S.Ct. 766 (O’Con-nor, J., dissenting). Thus, in cases applying the Wilder/Blessing test, the Court has also relied on the terms in which the statute is drafted.
Wilder itself is illustrative. In Wilder, a hospital filed a § 1983 action asserting a violation of the now-repealed Boren Amendment to the Medicaid Act, 42 *537 U.S.C. § 1396a(a)(13) (1994) (repealed 1997). The Boren Amendment required a state Medicaid plan to provide a class of providers[7] with payments that were “reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities” that comply with applicable state and federal laws and standards. Id. Holding that there was “little doubt” that the Boren Amendment was intended to benefit these providers, the Supreme Court stressed the Boren Amendment’s cost-reimbursement language, 496 U.S. at 503, 110 S.Ct. 2510, and noted that the Amendment “established a system for reimbursement of providers and [was] phrased in terms benefit health care providers.” Wilder, 496 U.S. at 510, 110 S.Ct. 2510 (emphasis added). Thus, the Court relied on language in the Boren Amendment that measured the adequacy of payments in relation to the economics of providers, i.e., their need to cover their reasonable costs. As the Court later emphasized in Suter v. Artist M., 503 U.S. 347, 357, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), Wilder “took pains to analyze the statutory provisions in detail.”
B.
With these standards in mind, we focus on the language of Section 30(A). Section 30(A) provides that a state plan for medical assistance must:
[P]rovide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.
Because this language is — to put it mildly — complex, it is helpful to break it down. Under Section 30(A), a state must provide “methods and procedures.” These “methods and procedures” must assure that payments to providers produce four outcomes: (1) “efficiency,” (2)“economy,” (3) “quality of care,” and (4) adequate access to providers by Medicaid beneficiaries.[8]
It seems clear to us that the first two required outcomes — “efficiency” and “economy” — relate to the state program, not providers, i.e., Section 30(A) requires that a state program set payments at levels that make the program efficient and economical.[9] What sort of payments would make a program inefficient and uneconomical? Payments that are too high. Accordingly, the directive to achieve “effi *538 ciency” and “economy” was obviously not intended to benefit providers.
That leaves the directives to provide “quality of care” and adequate access. These directives are “draft[ed] ... with an unmistakable focus on” Medicaid beneficiaries, not providers. Cannon, 441 U.S. at 691, 99 S.Ct. 1946. They are “phrased in terms benefiting” Medicaid recipients, Wilder, 496 U.S. at 510, 110 S.Ct. 2510, and these are the persons that Congress intended to benefit. If Congress had wanted to look after pharmacies, it would hardly have framed Section 30(A) in the terms it chose.
The language of Section 30(A) contrasts sharply with that of the Boren Amendment, which was interpreted in Wilder as intended to benefit the relevant providers. As previously noted, the Boren Amendment required a state Medicaid plan to provide payments to providers that were “reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities” that comply with applicable state and federal laws and standards. Pub.L. No. 96-499, § 962(a), 94 Stat. 2650 (1980). It was thus “phrased in terms benefitting” providers and measured the sufficiency of payments by reference to the economics of providers. It plainly manifested concern for the economic well-being of providers. Section 30(A), unlike the Boren Amendment, does not demand that payments be set at levels that are sufficient to cover provider costs. Unlike the Boren Amendment, it evinces no direct concern for the economic situation of providers. Instead, it demands that payments be set at levels that are sufficient to meet recipients’ needs. It is “phrased in terms benefitting” recipients, and the adequacy of payments is measured in relation to the health needs of recipients. It manifests concern solely for the well-being of recipients. It is therefore apparent from the statutory language that the intended beneficiaries of Section 30(A) are recipients, not providers.
The principal dissent disagrees with this analysis and maintains that the Boren Amendment and Section 30(A) “confer nearly identical rights on providers.” Principal Dissent at 544. The principal dissent makes two principal points. First, it dismisses the significance of the presence in the Boren Amendment and the absence from Section 30(A) of language focusing on provider costs. Second, it argues that quality of care played essentially the same role in the Boren Amendment as it does in Section 30(A). Neither point is well taken.
The language in the Boren Amendment focusing on provider costs is telling because it manifests a clear congressional concern for the economic plight of providers and an intent to benefit them. We are convinced that this statutory language was the basis for the Wilder Court’s statement that the Boren Amendment was “phrased in terms benefit” providers. 496 U.S. at 510, 110 S.Ct. 2510. The principal dissent interprets this statement to mean simply that the Boren Amendment “required states to establish a scheme for provider reimbursement.” See Principal Dissent at 544. But if this interpretation were correct, the Supreme Court’s full sentence (“The provision establishes a system for reimbursement of providers and is phrased in terms benefit health care providers”) would say exactly the same thing twice (“The provision establishes a system for reimbursement of providers,” 496 U.S. at 510, 110 S.Ct. 2510, and “require[s] states to establish a scheme for provider reimbursement,” Principal Dissent at 544). We therefore disagree with the principal dissent and believe that the reference to phrasing pertains to the Boren Amendment’s cost-reimbursement language.
*539 This cost-reimbursement language is also of particular significance in, to use the principal dissent’s phrase, “the dynamic of the real world of healthcare.”[10] Principal Dissent at 545. Cost reimbursement schemes[11] are generally favorable to providers and greatly disliked by those required to do the reimbursing.[12] The House Committee Report recommending repeal of the Boren Amendment cited a Congressional Budget Office estimate that its elimination would save $1.2 billion over four years,[13] and the National Governors’ Association provided even higher estimates.[14] We take no side in the policy debate about cost reimbursement, but we think .that it is highly unrealistic to minimize the significance of the presence in the Boren Amendment of cost-reimbursement language. This language was plainly a boon for providers; Congress surely understood its implications; and its inclusion in the Boren Amendment was an unmistakable sign of a congressional desire to benefit providers.
The principal dissent also misinterprets the Boren Amendment as containing a quality-of-care requirement similar to that in Section 30(A). See Principal Dissent at 545 (Boren Amendment “mandates minimum reimbursement rates defined by reference to quality of care ....”); id. at 33 (rates must be “sufficient to ensure quality of care”); id. at 33 (same). In fact, however, quality of care played a decidedly secondary role in the Boren Amendment. Whereas quality of care is a primary benchmark for setting payments in Section 30(A), the Boren Amendment simply provided that reimbursements were to be calculated by reference to the reasonable costs of providers that were operating in compliance with other applicable legal requirements — in the precise language of the Amendment, “with applicable State and Federal laws, regulations, and quality and safety standards....” 42 U.S.C. § 1396a(a)(13)(A)(1994) (repealed 1997). Thus, for example, in determining the reasonable costs of a nursing home, the Boren Amendment looked to nursing homes that were complying with state fire safety laws rather than those that cut costs by doing without fire escapes, smoke detectors, etc. *540 (The principal dissent obscures this point by repeatedly eliding the reference to “State and Federal laws[and] regulations” and referring only to “quality and safety standards.” See Principal Dissent at 549, 550, 551.)[15]
In attempting to point out what we view as the critical differences between the Boren Amendment and Section 30(A), we do not dispute the obvious point that these provisions have other features in common, as the principal dissent points out. For instance, the principal dissent is correct in noting that “[b]oth the Boren Amendment and Section 30(A) require states to reimburse providers for services rendered.” Principal Dissent at 550. But as we began by cautioning, the inquiry mandated by Wilder and Blessing — whether Congress intended for Section 30(A) to benefit providers as opposed to simply knowing that providers would be benefitted — calls for us to draw a fine line and to take into account the precise statutory language adopted by Congress. After considering the language of the Boren Amendment and Section 30(A), we remain convinced that there are critical differences and that Section 30(A), unlike the Boren Amendment, was not intended to benefit providers.
C.
We have examined the legislative history of Section 30(A) and have found nothing inconsistent with our reading of the statutory language. The plaintiffs note that when Section 30(A) was originally enacted in 1967, see Social Security Amendments of *541 1967, Pub.L. 90-248, § 237, 81 Stat. 821, 911 (1968), it differed in two respects from the current version: it required a state plan to assure that payments were “not in excess of reasonable charges,” and it lacked the adequate access requirement that the current version contains.[16] In 1981, Congress changed these features.
Nothing in the 1981 amendments suggests that the current version of the statute is intended to benefit providers. On the contrary, the effect of the 1981 amendments was to sharpen the focus on Medicaid beneficiaries. Language referring to providers’ charges was removed, and language providing a further protection for beneficiaries was added.
The plaintiffs note, however, that the House Committee Report on the 1981 amendments observed that “in instances where the States or the Secretary fail to observe these statutory requirements, the courts would be expected to take appropriate remedial action.” H.R.Rep. No. 97-158, vol. II, at 301(1981). This statement certainly suggests that the Committee anticipated that some class of plaintiffs would be able to sue to enforce Section 30(A), but it does not show that the Committee anticipated that Medicaid providers, as opposed to recipients, would be able to do so. It is thus of little value for present purposes.
The plaintiffs rely, finally, on certain HHS regulations that the plaintiffs view as showing that HHS has interpreted Section 30(A) as intended to benefit providers. We have examined these regulations, and we do not believe that they evidence any such interpretation. The most pertinent of the current regulations cited by the plaintiffs establish upper limits on what a state program may pay for drugs. See 42 C.F.R. §§ 447.301, 447.331-.334 (2001). Section 447.331(b), which applies to brand name drugs duly certified by a physician to be medically necessary for a particular recipient, is illustrative. This provision states that a state agency’s payments for such drugs
must not exceed in the aggregate, payment levels that the agency has determined by applying the lower of the—
(1)Estimate acquisition costs plus reasonable dispensing fees established by the agency; or
(2)Providers’ usual and customary charges to the general public
These regulations do not assist the plaintiffs here for the obvious reason that they merely set a ceiling, but no floor, on what providers must be paid. Any payments below the ceiling, no matter how low, would satisfy the regulation. Accordingly, the regulations do not show that the Secretary has interpreted Section 30(A) as intended to benefit providers; nor can they be viewed as themselves intended to benefit providers.[17]
In sum, we are convinced that Section 30(A) is not intended to benefit providers *542 and that therefore providers may not assert a Section 30(A) claim under § 1983.
D.
Of the other courts of appeals that have considered the question whether providers may assert a Section 30(A) claim under § 1983, the Fifth Circuit’s opinion contains the most thorough analysis of the intended-to-benefit requirement. See Evergreen Presbyterian Ministries, Inc. v. Hood, 235 F.3d 908, 928-29 (5th Cir.2000); see also Walgreen Co. v. Hood, 275 F.3d 475 (5th Cir.2001). In Evergreen Presbyterian Ministries, the Fifth Circuit wrote:
Section 30(A) ... focuses on recipients in that it is directly keyed to the recipients’ access to medical care, and as a result, the recipients are the direct intended beneficiaries of the section.... [I]n contrast to the Boren Amendment, section 30(A) does not create an individual entitlement in favor of any provider. The section benefits recipients by ensuring there is an adequate number of providers in the marketplace. Therefore, it may be true that health care providers as a group are indirectly benefitted by section 30(A) because the section requires that the payments to providers be sufficient to ensure that Medicaid recipients have equal access to medical care. But it cannot be said that section 30(A) necessarily confers upon each provider an individual right to a particular payment because the section does not focus directly on providers.
235 F.3d at 928-29 (emphasis in the original). We agree with the Fifth Circuit’s analysis and holding.
Prior to the decision in Evergreen Presbyterian Ministries, the First, Seventh, and Eighth Circuits had held that providers may pursue a Section 30(A) action under § 1983, but we decline to follow these decisions. See Visiting Nurse Ass’n of North Shore, Inc. v. Bullen, 93 F.3d 997, 1004 (1st Cir.1996); Methodist Hospitals, Inc. v. Sullivan, 91 F.3d 1026, 1029 (7th Cir.1996); Arkansas Med. Soc’y, Inc. v. Reynolds, 6 F.3d 519, 526 (8th Cir.1993).[18]
In Arkansas Medical Society, the Eighth Circuit reasoned as follows:
The question of whether the Medicaid providers are intended beneficiaries is ... easily resolved. Wilder concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. Wilder, 496 U.S. at 510, 110 S.Ct. at 2517. Similarly, the equal access provision [of Section 30(A) ] addresses payment for “care and services” provided by noninstitutional providers. The providers here are beneficiaries for the same reason that the providers in Wilder were beneficiaries.
6 F.3d at 526 (emphasis added).
This analysis pays little attention to the differing terms of the Boren Amendment and Section 30(A) and is thus inconsistent with the reminder in Suter to examine each particular statutory provision “in detail.” 503 U.S. at 357, 112 S.Ct. 1360. Arkansas Medical Society fails to note that the Boren Amendment was keyed to providers’ costs, whereas Section 30(A) focuses on the care and services available to recipients. Moreover, while Arkansas Medical Society read Wilder to mean that the Boren Amendment was intended to benefit providers simply because it “concerned their reimbursement,” 6 F.3d at 526, Wilder actually relied on the fact that the Boren Amendment “establishe[d] a *543 system for reimbursement of providers and [ivas] phrased in terms benefit health care providers.” Wilder, 496 U.S. at 510 (emphasis added). As we have noted, the same cannot be said of Section 30(A).
In Methodist Hospitals, Inc. v. Sullivan, supra, the Seventh Circuit held that Medicaid providers may assert Section 30(A) claims under § 1983, but the opinion provides no indication that the Seventh Circuit was presented with the question whether Section 30(A) was intended to benefit providers. Instead, the opinion merely addresses-and rejeets-the district court’s holding that providers could not sue under Section 30(A) because the term “geographic area”[19] is so “vague and amorphous” that its enforcement would strain judicial competence. Methodist Hospitals v. Indiana Family and Social Services Admin., 860 F.Supp. 1309, 1331—33 (N.D.Ind.1994).
In Visiting Nurse Ass’n of North Shore, Inc. v. Bullen, supra, the argument presented to the First Circuit regarding the intended-to-benefit requirement was notably different from the argument presented to us. In Visiting Nurse Ass’n, it was argued that Section 30(A), unlike the Boren Amendment, is not intended to benefit providers because Section 30(A) “does not list specific categories of health care providers (e.g., hospitals, nursing facilities, and intermediate care facilities.)” 93 F.3d at 1004. The First Circuit rejected this attempted distinction and wrote:
The Wilder Court first observed that the statute “is phrased in terms benefit health care providers,” and leaves “little doubt that health care providers are the intended beneficiaries,” then proceeded to illustrate how the plain language of the Boren Amendment “establishes a system for reimbursement of providers” through its listing of specific types of health care providers. Nowhere did the Court indicate that the more general term “providers” would not suffice, however, or that a fisting of specific types of providers is a sine qua non without which a congressional intent to benefit health care providers could not be inferred. As long as the two statutory provisions evince a congressional concern for preserving financial incentives to providers — by ensuring adequate reimbursement payment levels — providers are appropriately considered intended beneficiaries. See Arkansas Med. Soc’y, Inc., 6 F.3d at 526.
93 F.3d at 1004 (italics in quotations from Wilder added by First Circuit). To the extent that the First Circuit rejected the particular argument advanced to it, its decision has no bearing on the issue we address here. And to the extent that the First Circuit simply adopted the reasoning of Arkansas Medical Society, we find that reasoning unpersuasive for the reasons already explained.
After considering all of the decisions of other courts of appeals on the question before us, we agree with the Fifth Circuit’s analysis in Evergreen Presbyterian Ministries, and we respectfully decline to follow the contrary courts of appeals, decisions.
E.
Our conclusion that providers may not assert Section 30(A) claims under § 1983 does not mean that Section 30(A)’s important “quality of care” and access requirements will go unenforced. Not only is HHS responsible for ensuring that state plans are administered in accordance with *544 these requirements, see 42 U.S.C. § 1396c, but Medicaid recipients plainly satisfy the intended-to-benefit requirement and are thus potential private plaintiffs. In other parts of the country, recipients have sued to enforce Section 30(A), and the other courts of appeals have uniformly held that recipients may assert such claims under S 1983. See Evergreen Presbyterian Ministries, 235 F.3d at 927; Visiting Nurse Ass’n, 93 F.3d at 1004 n. 7; Arkansas Medical Society, 6 F.3d at 526. If, as the plaintiffs in this case allege, the rates set under the HealthChoices program are so low that compliance with the “quality of care” and access requirements is threatened, we see no reason to believe that recipients in the affected area of the Commonwealth will not seek legal redress to ensure that these critical mandates are met.
IV.
For the reasons explained above, the order of the District Court is affirmed.

. The Pennsylvania Pharmacists' Association is a non-profit corporation representing over 440 independent pharmacies and over 1,000 pharmacists employed at these pharmacies.

. The "estimated acquisition cost” is the "agency’s best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers.” 42 C.F.R. § 447.301 (2001).

. The waiver applies to 42 U.S.C. § 1396a(a)(l)(statewide scope), § 1396a(a)(10)(B)(comparability of services), and § 1396a(a)(23)(freedom of choice).

. The Rite Aid panel wrote as follows in footnote 7 of the opinion:
The Department argues at least in part that Rite Aid and the PPA [Pennsylvania Pharmacists Association] may not sue to enforce [certain] Medicaid regulations as section 30(A) "does not support a private cause of action.” Brief at 27. The district court rejected this argument and we agree with this result. Rite Aid, 998 F.Supp. at 525-26.
171 F.3d at 850.

. If the intended-to-benefit requirement could be satisfied simply by showing that a plaintiff in fact benefits from the law in question, the requirement would be superfluous. No plaintiff may assert a claim in federal court without establishing Article III standing, and this demands, among other things, that the plaintiff demonstrate “injury in fact.” See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A plaintiff asserting a claim based on an alleged violation of a federal law cannot demonstrate injury in fact unless proper enforcement of the law would benefit the plaintiff. Therefore, if the intended-to-benefit requirement could be met simply by showing that the plaintiff would benefit by proper enforcement, that requirement would add nothing to the injury-in-fact test.

. In determining whether a statute creates an implied right of action, the Supreme Court uses the four-part test of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether Congress intended to create a private remedy. Under this test, the Court considers (1) whether the plaintiff is within the class " 'for whose especial benefit’ the statute was enacted,” (2) whether "there [is] any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one,” (3) whether a private remedy would be "consistent with the underlying purposes of the legislative scheme,” and (4) whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States.” Id. at 78, 95 S.Ct. 2080 (citations omitted). A § 1983 plaintiff need not prove that Congress specifically intended that a particular statutory right be enforceable under S 1983 but instead need only meet the three-part test outlined above. Wilder, 496 U.S. at 508 n. 9, 110 S.Ct. 2510.

. Namely, hospitals and nursing and intermediate care facilities. See Wilder, 496 U.S. at 502 n. 2, 110 S.Ct. 2510.

. We use the phrase "adequate access” simply as shorthand for the statutory requirement that providers be "available under the plan at least to the extent that such care and services are available to the general population in the geographic area.” We do not suggest that “adequate access” in the lay sense of the term will or will not meet this statutory requirement.

.Although the plaintiffs argue that these terms refer to the operation of pharmacies, this does not make sense. Suppose payments to pharmacies were set far above cost. That would not make them inefficient or uneconomical, i.e., "wasteful." Webster’s Third New International Dictionary (1971). It would simply malte them very profitable. Conversely, suppose payments to pharmacies were set well below costs. That also would not make them inefficient or uneconomical. It would simply make participation in the Medicaid program unprofitable and might lead them to withdraw.

. In its description of the "real world” "context” of this case, the principal dissent (at 545, 545-46) summarizes the plaintiffs’ (but not the defendant's) evidence about the effect of the new rates on access to pharmacies. But (1) the plaintiffs’ position is disputed; (2) the District Court, which reached the merits of the access issue, held that the plaintiffs had not adduced sufficient evidence to show that the access requirement was not being met, Pennsylvania Pharmacists Ass’n, 2000 WL 730344, at * 6-8; and (3) the principal dissent does not purport to have examined or to reach the merits of this issue. We express no view whatsoever on the merits of this question.

. Before the Boren Amendment, states, as a practical matter, tended to pay for "the actual costs incurred by hospitals in providing care to Medicaid recipients, regardless of disparities in costs or efficiencies among hospitals.” New Jersey Hosp. Ass’n v. Waldman, 73 F.3d 509, 511 (3d Cir.1995). The Boren Amendment replaced this actual-cost-reimbursement scheme with a reasonable-cost-reimburse- , ment scheme. See id. at 514-15.

. The National Governors' Association unanimously recommended repeal of the Boren Amendment. See Governors’ Medicaid Proposals: Hearing Before the House Comm. on Commerce, 104th Cong. 22-56 (1996) (statement of Governors Thompson, Miller, Chiles, Angler, and Leavitt); Governors' Perspective on Medicaid: Hearing Before the Subcomm. on Health and Environment of the House Comm. on Commerce, 105th Cong. 18-23 (1997) (statement of Governors Miller and Leavitt) ("The Boren amendment and other Boren-like statutory provisions must be repealed. 'One hundred percent reasonable cost reimbursement' must be phased out....").

. H.R. Rep. 149, 105th Cong., 1st Sess. 547 (1997).

. See 1997 WL 8219815 (March 11, 1997) (Testimony of Govs. Miller and Leavitt before Sen. Fin. Comm.).

. We also disagree with Judge Rendell’s view that Section 30(A) manifests an intent to benefit providers simply because it says that a state plan must provide methods and procedures "relating to the utilization of, and payment for, care and services available under the plan.”
First, Judge Rendell's analysis looks at only part of Section 30(A), but we do not think that it is possible to determine whether Section 30(A) was intended to benefit providers or just recipients without looking at the entire provision. Moreover, although Judge Rendell would look at only one part of Section 30(A) in determining whether that provision was intended to benefit providers, we assume that she would look at the rest of the provision in determining whether Section 30(A) meets the next requirement set out in Wilder and Blessing, viz., that the right allegedly protected by the statute must not be so "vague and amorphous” that its enforcement would strain judicial competence. Blessing, 520 U.S. at 340-41; Wilder, 496 U.S. at 509. If she did not do so — if she confined her analysis of this question to tire portion of the statute that she examines in relation to the intent-to-benefít issue — she would have to conclude that this second requirement cannot be met. If Section 30(A) simply said that a state plan must "provide ... methods and procedures relating to the utilization of, and the payment for, care and services available under the plan,” it would not set out a standard that a court could enforce. The substance of what a state plan must meet is set out in the portion of Section 30(A) that follows, and this part of the provision cannot be ignored. We see no justification for examining only one part of a statute in considering the intent-to-benefit issue and then considering other parts of the statute in considering other prongs of the Wilder/Blessing inquiry.
Second, if the mere reference to "payment” in the part of Section 30(A) that Judge Ren-dell examines were enough to show an intent to benefit providers, it would be virtually impossible to draft a provision requiring a state plan to provide services without creating an entitlement to sue on behalf of the providers who furnish those services. Providers, after all, must be paid, and according to Judge Rendell’s position, if a statute makes any mention of "payment,” it evidences an intent to benefit providers. It is interesting to apply Judge Rendell's analysis to the current version of 42 U.S.C. § 1396a(a)(13), which replaced the Boren Amendment. One of Congress’s main objectives — perhaps its dominant objective — in repealing the Boren Amendment was to take away the right to sue under § 1983, but the provision that replaced the Boren Amendment, refers to the "determination of rates of payment under the [state] plan” and goes on to refer repeatedly to “rates.”

. As enacted in 1967, it required a state to:
provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan as may be necessaiy to safeguard against unnecessary utilization of such care and services and to assure that payments ... are not in excess of reasonable charges consistent with efficiency, economy, and quality of care.
This provision originated as a Senate amendment to the House bill, and the brief discussion of this provision in the Conference Committee report says nothing that has a bearing on the issue before us. See Conf. Rep. No. 1030, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.C.C.A.N. 3179, 3213 (1967).

. In South Camden Citizens In Action v. New Jersey Dep’t of Envtl. Protection, 274 F.3d 771 (3d Cir.2001), we held that a regulation may invoke a private right of action that Congress created through statutory text but may not create a new right.

. In Orthopaedic Hosp. v. Belshe, 103 F.3d 1491 (9th Cir.1997), the Court held in favor of a hospital that appealed an adverse decision regarding a Section 30(A) claim brought un~ der § 1983. However, the Court's opinion provides no indication that the hospital's right to proceed under § 1983 was challenged, and the Court did not address the issue.

. As previously noted, Section 30(A) requires that a plan assure that "care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a (30)(A)(emphasis added).